1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2

3    Criminal Action No. 10-CR-00129-REB

4    UNITED STATES OF AMERICA,

5         Plaintiff,

6    vs.

7    DOMINIC D. STEWART,

8         Defendant.

_____

9
                        REPORTER'S TRANSCRIPT
10                 (Jury Trial - Day 1 - Volume 2)

11   _____

12

13

14           Proceedings before the HONORABLE ROBERT E. BLACKBURN,

15   Judge, United States District Court for the District of

16   Colorado, occurring at 8:46 a.m., on the 27th day of February,

17   2012, in Courtroom A1001, United States Courthouse, Denver,

18   Colorado.

19

20

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
          Produced via Computer by Tracy Weir, 901 19th Street,
25       Room A258, Denver, Colorado, 80294, (303) 298-1207

1                          *   *   *   *   *

2                              APPEARANCES

3           ROBERT TROYER and SUSAN "ZEKE" KNOX, Assistant U.S.

4    Attorneys, 1225 17th Street, Suite 700, Denver, Colorado,

5    80202, appearing for the plaintiff.

6              THOMAS J. HAMMOND, Attorney at Law, Thomas J. Hammond,

7    P.C., 955 Bannock Street, Suite 200, Denver, Colorado 80204,

8    appearing for the defendant.

9              FRANCES SIMONET, Attorney at Law, 1544 Race Street,

10   Denver, Colorado 80206, appearing for the defendant.

11                             PROCEEDINGS

12           (Statements by the Court and counsel on behalf of

13   plaintiff and defendant were made and reported and voir dire

14   was commenced and completed and are bound in a separate

15   volume.)

16        *THE COURT:*  Thank you.  You may be seated or remain

17   standing pending the availability of the jury.

18           Madam clerk, would you escort the jury into the

19   courtroom.

20        *MR. HAMMOND:*  Your Honor, after the jury comes out,

21   after openings we'll proceed into evidence.

22        *THE COURT:*  We'll be done by 5:00, it appears to me.

23        *MR. HAMMOND:*  We'll start with one witness.  That is

24   Michael Vail.  I have exhibit notebooks, but I haven't gotten

25   the exhibit list yet.  I apologize.  I have talked to

1   Mr. Troyer.  He didn't have a problem.  I believe that Mr. Vail

2   will authenticate and we can get in four photographs from our

3   exhibit book.  I just wanted to have that okay with the Court.

4           THE COURT:  Appreciate it.  It will work for me if it

5   does for the Government.

6           MR. TROYER:  It does.

7           THE COURT:  Very well.  Madam clerk, would you show

8   our jury into the courtroom and the jury box, please.  Thank

9   you.

10          (At this time the jury entered the room.)

11          THE COURT:  Thank you, and please be seated.  Don't

12  worry, ladies and gentlemen of the jury, with time and

13  practice, and there will be both, your choreography as you

14  enter and exit the jury box will improve.  We're prepared to

15  proceed on the record.  Let us do precisely that.  You have

16  been provided with notepads and pencils.  This implies that you

17  may, and you may, take notes during the trial.  However, you

18  are not required to do so.

19          Again, I encourage you to write your name on your

20  note-taking materials, again for the obvious purpose of

21  distinguishing your notes from those of your colleagues.

22          Now, these notepads may be used by you here in the

23  courtroom during the trial and during the jury room during your

24  deliberations at the end of the trial.  You may take your notes

25  between the jury room and the courtroom and no other place.

1    They don't leave during mid-morning, mid-afternoon recesses.

2    They don't go with you over the noon recess, and they do not

3    accompany you home or to your place of business.

4         At the conclusion of the trial, I will harvest your

5    notes.  They will be destroyed.  They will not be read,

6    reviewed, or preserved in any way.  If you take notes, again

7    your choice, you should not let your note taking detract from

8    your close attention to the testimony given or the other

9    evidence presented during these important trial proceedings.

10   Frankly, I encourage you to take notes sparingly.  Do not try

11   to summarize all of the evidence, but notes can be particularly

12   helpful, for example, in recording and recalling such things as

13   dates, times, places, measurements, identities, and

14   relationships.

15        Whether or not you take notes, please plan to rely on

16   your memory as much as possible and not on your notes or those

17   of other jurors.  Any notes you take are to refresh your

18   individual memory.

19        Again, I will reread you the charges in the indictment

20   that relate to Mr. Stewart, and I instruct you, once again,

21   that neither the indictment nor the charges or allegations in

22   the indictment constitute evidence of anything in the trial of

23   this case.

24        In the indictment, in Count 1, it is charged as

25   follows:  On or about and between May 26, 2005, and June 1,

1   2005, in the state and district of Colorado, at the United

2   States Penitentiary Administrative Maximum in Florence,

3   Colorado, a place within the special maritime and territorial

4   jurisdiction of the United States, defendant Dominic D. Stewart

5   willfully, deliberately, maliciously, and with premeditation

6   and malice aforethought did unlawfully kill Gregory Joiner, a

7   human being.  This is a charge of murder in the first degree.

8          In Count 2, it is charged and alleged as follows:  On

9   or about and between May 26, 2005 and June 1, 2005, in the

10  state and district of Colorado, at the United States

11  Penitentiary Administrative Maximum in Florence, Colorado, a

12  place within the special maritime and territorial jurisdiction

13  of the United States, defendants Dominic D. Stewart and James

14  Duckett, with malice aforethought, did unlawfully kill Gregory

15  Joiner, a human being and, further, defendants, Dominic D.

16  Stewart and James Duckett, did aid, abet, counsel, command,

17  induce, and procure each other's participation in the

18  commission of this offense.  Count 2 charges the crime of

19  murder in the second degree.

20         Now, I instruct you that a separate crime is charged

21  in each of counts 1 and 2 of the indictment, and, thus, each

22  charge and the evidence pertaining to that charge should be

23  considered separately by you, the jury.  The fact that you may

24  find Mr. Stewart guilty or not guilty as to one of those two

25  counts with which he is charged should not control your verdict

1    as to the other crime charged in the other count.

2         You must give separate and individual consideration to

3    each charge and count against Mr. Stewart.  Mr. Stewart is not

4    on trial for any acts or conduct not specifically charged in

5    the indictment.

6         Let me take this opportunity now to describe to you

7    step by step the procedural protocol that we shall follow for

8    the balance of these trial proceedings.  First, the Government

9    and Mr. Stewart may make an opening statement.  However, under

10   our system, Mr. Stewart may defer his opening statement until

11   after the Government has presented its evidence against him in

12   its case in chief.

13        I instruct you that opening statements are not

14   evidence.  Their purpose is to help you understand what the

15   evidence will be from the perspective of each of the parties.

16   Therefore, what the attorneys say to you or show to you during

17   opening statements is not evidence and may not be considered or

18   used by you as such.

19        Following opening statements, or the opening statement

20   of the Government, as the case may be, the evidence in the case

21   will be presented.  Evidence consists of the sworn testimony of

22   the witnesses, all exhibits received in evidence, and any fact

23   that may be admitted, stipulated, or judicially noticed.

24   Again, the indictment and the charges and allegations in it are

25   not evidence.

1    The mere number of witnesses appearing for or against

2    a certain side, fact, proposition, or issue in this case does

3    not in and of itself prove or disprove that side, that fact,

4    that proposition, or that issue.  There are, essentially, two

5    types of evidence from which a jury may properly find the truth

6    as to the facts in a trial of a case.  One is called direct

7    evidence, evidence from an eyewitness or an ear witness or a

8    so-called percipient witness.  All other evidence is indirect

9    or, as we say, circumstantial evidence, from which other facts

10   may be inferred.

11   No law makes a distinction between direct and

12   circumstantial evidence.  The Government presents its evidence

13   first.  Mr. Stewart may cross-examine all witnesses and

14   evidence presented against him by the Government.  After the

15   Government has presented its evidence in its case in chief,

16   Mr. Stewart may present evidence in his own behalf, but, as I

17   have instructed you previously, he is not required or obligated

18   to do so.  I remind you importantly that Mr. Stewart is

19   presumed to be innocent now and throughout the trial.  The

20   Government has the burden of proof, which requires, for a

21   conviction of anything, proof beyond a reasonable doubt.  In a

22   criminal trial, whether in state or federal court, a defendant

23   such as Mr. Stewart does not have to prove his innocence or

24   call any witnesses or conduct any examination or

25   cross-examination or introduce any independent evidence,

1   although he may do some or all of those things.

2         If Mr. Stewart presents evidence, the Government may

3   cross-examine any witness called by Mr. Stewart during his

4   defense.  If Mr. Stewart does present evidence, then under

5   certain limited circumstances, the Government may be permitted

6   to present what is called rebuttal evidence.  At the conclusion

7   of the evidence, regardless of who presents it, I will instruct

8   you on the rules of law applicable to the trial of this case.

9   I will literally read those rules of law to you from written

10  jury instructions.  You, of course, will take the originals

11  with you to your jury deliberation suite for use during your

12  solemn deliberations.

13        Additionally, each of you will have a complete set of

14  the copies of the jury instructions for your own independent

15  note-taking purposes.

16        After you have heard all of the evidence, after I have

17  instructed you on the law, then these parties may make closing

18  arguments, sometimes known as final arguments, or closing

19  statements or summations.  Commencing with the Government,

20  followed by Mr. Stewart, and then concluding with the

21  Government by way of rebuttal.

22        The case then will be formally submitted by this Court

23  to you, the jury, to commence your solemn deliberations.

24        One of your principal purposes as jurors is to decide

25  what the facts are, and your decision must be based solely on

1  the evidence and all reasonable inferences there from.  Again,

2  I instruct you importantly that neither sympathy, bias,

3  prejudice, nor public opinion should influence your

4  participation or your ultimate decisions in the trial of this

5  case.

6       I've already told you many things that you should

7  expect to decide who and what to believe in the trial of this

8  case.  You should carefully consider all of the testimony given

9  and the circumstances under which each witness testifies during

10 this trial.  Consider each witness's knowledge, motive, state

11 of mind, demeanor, and manner while on the witness stand.

12 Consider also each witness's means of knowledge, ability to

13 observe, and strength of memory.  Consider also any

14 relationship each witness may have to either side in the trial

15 of this case, the manner in which each witness may be affected

16 by your verdicts in the trial of this case, and the extent to

17 which, if at all, each witness is either supported or

18 contradicted by other evidence, including other witness

19 testimony presented during the trial.

20      In short, but importantly, you should consider

21 carefully all facts and circumstances shown by the evidence

22 which affects the credibility of each witness's testimony, and

23 then, ladies and gentlemen of the jury, you may believe all of

24 the testimony of a specific witness, or part of that testimony,

25 or absolutely none of that testimony.

1              Now, as you already know, because I've told you, it's

2    my job to decide what rules of law apply in the trial of this

3    case.  Consistent with your solemn oath, you must follow all of

4    the rules of law as I instruct you, as I explain them to you.

5    You are not at liberty to follow some and ignore others.  Even

6    if you disagree or don't understand the reason or the rationale

7    for some of those rules of law, nevertheless, you must follow

8    them.

9              You will then apply those rules of law to the facts

10   which you will determine from the evidence, and, in that way,

11   ultimately, you, the jury, will determine whether the

12   Government has proven the guilt of Mr. Stewart beyond a

13   reasonable doubt as to the crimes charged in counts 1 and/or 2

14   of the indictment.

15             Now, again, concerning reasonable doubt, that's the

16   standard.  It is not required that the Government prove guilt

17   beyond all possible doubt.  The test is one of reasonable

18   doubt.  Proof beyond a reasonable doubt is proof that leaves

19   you, as a juror and as a jury, firmly convinced of the guilt;

20   in this case, of Mr. Stewart.

21             There are many things in this world we know -- strike

22   that.  There are few things in this world we know with absolute

23   certainty, and in a criminal case and trial such as this one,

24   the law does not require proof that overcomes every possible

25   doubt.  It is only, and importantly, required that the

1   Government's proof exclude any reasonable doubt concerning the

2   guilt of Mr. Stewart.

3        A reasonable doubt is a doubt based on reason and

4   common sense after careful and impartial consideration of all

5   the evidence, or the lack of evidence, in the case.  If, based

6   on your consideration of the evidence, you are firmly convinced

7   that Mr. Stewart is guilty of the crime, then under your

8   consideration, you must find him guilty of that specific crime.

9        However, if, on the other hand, you think there is a

10  real possibility that he is not guilty, you must give him the

11  benefit of the doubt and find him not guilty.

12        Testimony and evidence may be admitted into evidence

13  during a trial if that testimony or that evidence satisfies

14  certain legal criteria or standards.  Please understand that

15  it's the right, it's the duty of an attorney to object when

16  testimony or other evidence is offered which that attorney

17  believes is inadmissible.  Please understand that it is only by

18  offering an objection that the attorney may request and receive

19  a ruling from me on the admissibility of that evidence.  And

20  you, therefore, must not be prejudiced against any attorney or

21  party because an attorney makes an objection.  And you must not

22  attempt to interpret my rulings on objections as somehow

23  indicating how I think you should decide this case ultimately.

24  That is your prerogative exclusively.  I am only ruling on

25  questions of law that are presented to me.

1          Now, at times I may sustain objections or direct that

2    you disregard certain questions, testimony, exhibits, answers,

3    or other information, and you may not guess or speculate about

4    what the answer or evidence might have been.  And you must not

5    consider any evidence to which an objection has been sustained

6    or which I have instructed you to disregard.

7          At other times, I may overrule objections to questions

8    or answers.  In those circumstances, you must not give any such

9    evidence any more weight simply because I overruled the

10   objection.  At times, I may limit the introduction of evidence

11   for a specific purpose, and you may not consider such evidence

12   for any other purpose.

13         Now, any evidence to which I have sustained an

14   objection or which I have stricken or which I have instructed

15   you to disregard must be disregarded entirely.  Occasionally,

16   ladies and gentlemen, legal arguments are required to be

17   considered outside your hearing or, in some instances, outside

18   your hearing and presence altogether.  Those circumstances,

19   obviously, will cause some delay in the trial proceedings, but

20   please understand that on all such occasions while you're

21   waiting patiently, we're working diligently, and the purposes

22   of these conferences, whether they're conducted here at my

23   bench, or while you are outside the courtroom, is not to keep

24   relevant evidence from you but, instead, to decide how certain

25   potential evidence is to be treated under the rules of evidence

1    and to avoid prejudice, confusion, and legal error.

2          Now, of course, all of us will do what we can to keep

3    the number and length of those conferences to a minimum.   In

4    fact, I may not grant an attorney's request for such a

5    conference.  And do not consider my granting or denying a

6    conference as my opinion of the case or what your verdicts

7    should be.  Do not be prejudiced for or against any attorney or

8    party if I grant or deny a request for such a conference.  All

9    rulings I'm required to make in the trial of this case will be

10   based solely on the applicable law.  You must not infer from my

11   ruling that I make or from anything that I say or do during the

12   trial that I hold any views, either for or against any party to

13   this case.

14         Periodically, it may become necessary for me to

15   admonish counsel, and you should not be prejudiced against an

16   attorney or his or her client because of any such admonishment.

17   I do not permit jurors to ask questions of the witnesses or

18   attorneys.  Therefore, please do not interrupt the attorneys

19   during their examination or cross-examination of the witnesses.

20   However, there's an important exception.  If you are unable to

21   hear an attorney or a witness, please bring that to my

22   attention and I will rectify that situation.

23         Now, again, as I instructed you as prospective jurors,

24   during recesses and adjournments of court, you will not be

25   sequestered.  Instead, you'll be free to separate and to leave

1   this federal courthouse and go your separate ways, subject

2   always, of course, to the important rules that govern your

3   communication, conduct, and deportment as jurors in this

4   important trial.

5          Now, it's February, soon to be March in Denver,

6   Colorado.  I recommend probably consistent with that of

7   Ms. Steffens that you pack and keep with you an overnight case

8   in case you must remain in downtown Denver overnight due to

9   inclement weather or otherwise.

10          Now, you already know Ms. Steffens is my courtroom

11   deputy clerk.  Now you know she'll be serving as your bailiff.

12   In that capacity, it is her duty and responsibility to take

13   care of your needs during the course of the trial.

14   Ms. Steffens is not your attorney.  Do not discuss the case or

15   the trial with her.  Do not seek legal advice from her about

16   this case or otherwise.  If you have a personal problem or

17   need, please take that up with Ms. Steffens, and she will

18   notify me.

19          Now, among you, ladies and gentlemen, are 12 regular

20   jurors and two alternate jurors.  Those alternate jurors will

21   remain anonymous until the commencement of the deliberations of

22   the 12 regular jurors, or until further order of this Court.

23   Therefore, all of you must pay close attention to all that

24   which transpires during the trial of this case.  Why?  Because

25   you may not assume from your seating position that you are a

1    regular or an alternate juror.

2         Now, pursuant to Federal Rules of Evidence, Rule 615,

3    except for parties, their representatives, attorneys, advisory

4    witnesses, and witnesses granted exemption from sequestration,

5    all other witnesses who may testify during the course of this

6    trial must now leave and remain outside the courtroom and are

7    prohibited from discussing their testimony with anyone, other

8    than legal counsel, pending further order of this Court.

9         I turn to the Government and counsel for Mr. Stewart.

10   Please advise all prospective witnesses as soon as practicable

11   of this standing order of sequestration.

12        Ladies and gentlemen, I conclude, essentially, where I

13   commenced with a discussion about opening statements, which are

14   about to be rendered.  They are not evidence and may not be

15   considered or used by you as such during the trial of this

16   case.

17        Very well.  If the Government is prepared to make its

18   opening statement, it may.  Ms. Knox.

19        *MS. KNOX:*  Thank you, Your Honor.

20        *THE COURT:*  You're welcome.

21                    **OPENING STATEMENT**

22        *MS. KNOX:*  May 26 of 2005.  Gregory Joiner, also known

23   as D, got up that morning.  He did the things he did every

24   morning.  He had a routine.  He did things consistently, and,

25   just like you or I would, he got up, eventually went to work,

1    came home from work, and he took a shower.

2          Gregory Joiner came home from work at approximately

3    3:00ish.  He went to get in the shower, like he did everyday

4    all the time, and, while he's on his way to the shower, he's

5    confronted.  He's confronted by his upstairs neighbor, the

6    defendant.  And during this confrontation, a fight breaks out.

7    The fight breaks out, and another upstairs neighbor joins the

8    confrontation.  By shortly after 3:00 p.m., Gregory Joiner is

9    lying on the floor with his head split open, bleeding,

10   unconscious, and in very, very serious condition.

11         Gregory Joiner is taken to the hospital in an

12   ambulance.  Ladies and gentlemen, he's not taken to the

13   hospital in an ambulance like you and I would be in the outside

14   world.  Gregory Joiner goes to Parkview Medical Center in

15   Pueblo, Colorado, in the back of an ambulance, yes, in

16   restraints, in handcuffs, even though he's unconscious, even

17   though he's intubated, even though he's not moving, not

18   talking, not conscious.  He goes to Parkview Medical Center in

19   Pueblo with an armed guard, five officers, guns, and you'll

20   hear when he got to the hospital, he underwent a craniectomy, a

21   surgery to try to help the swelling in his brain.  And even

22   under surgery, he's under restraint and the guards are outside

23   the operating room.

24         Ladies and gentlemen, on May 26, 2005, Gregory Joiner

25   goes to that hospital in dire medical condition, undergoes the

 1   surgery, and on June 1, 2005, he dies.

 2          Why is Gregory Joiner under restraint?  Why is he

 3   under armed guard?  Why is he in a place unlike the outside

 4   world?  It's very simple, ladies and gentlemen.  Gregory Joiner

 5   is an inmate at the Supermax.  He's an inmate at ADX,

 6   Administrative Maximum prison, a facility operated by the

 7   Bureau of Prisons in Florence, Colorado.

 8          When Gregory Joiner gets up that morning, he does go

 9   to work.  He goes to work at Unicor.  It is a prison-based

10   company that allows inmates to work.  When he comes home that

11   day, he goes back to his cell.  That cell is on the lower tier

12   of the K-Unit A-range in the Administrative Maximum.  It is the

13   step-down program.  What you'll hear about the step-down

14   program is that the step-down program is a program within the

15   prison where inmates who had been classified at one level are

16   allowed to move through the program based on good behavior to

17   try to get to another level.

18          The upstairs neighbor, ladies and gentlemen, who

19   attacked Mr. Joiner, is this man sitting right here, defendant

20   Dominic Stewart.  And a second neighbor, also an inmate living

21   on the upper tier of that K-Unit A-Range, is James Duckett.

22          You will hear that Dominic Stewart and Gregory Joiner

23   didn't like each other very much.  Mr. Joiner talked about

24   things behind Mr. Stewart, the defendant's, back, and the

25   defendant didn't like that.  Something that might seem like

1   this on the outside world, just talk behind someone's back,

2   you'll hear is a very big deal inside the Administrative

3   Maximum.

4        You will hear that Mr. Joiner's statements about the

5   defendant angered him and upset him and, ladies and gentlemen,

6   played on every insecurity that the defendant had about himself

7   because in prison perception is important, and the defendant

8   certainly didn't like what Gregory Joiner was doing to others'

9   perception of him.

10        While this is going on and Mr. Joiner is talking

11   behind the defendant's back making statements, the defendant is

12   simmering.  He's a simmering kettle of insecurity.  And it

13   finally comes to a boiling point, and that kettle boils over.

14        Mr. Joiner was a person who was trying to work his way

15   through this program, much like the other inmates in that

16   facility.  Mr. Joiner, you'll hear, stayed away from things,

17   but you'll also hear that Mr. Joiner did, in fact, not like

18   Mr. Stewart, the defendant, and, in fact, in front of people

19   would say things, like, You better just check in.  Just check

20   in.  In the inside world of Administrative Maximum, checking in

21   is a big deal.  It means checking in with the authorities, with

22   the Bureau coming out of the unit.  Just check in.  It's a sign

23   of weakness.  Gregory Joiner said that to Mr. Stewart and told

24   him to do it in front of other people.  That made Mr. Stewart,

25   the defendant, very, very angry.

1          You will hear from other inmates in that unit who knew

2    both of these men that the defendant would say things like, I'm

3    going to kill him.  I'm going to kill him.  I'm going to kill

4    him, leading up to the time frame of May 26, 2005.  Defendant

5    was angry, that Mr. Joiner would dare, would dare to say these

6    things about him; you better just check in.

7          So the defendant said to other inmates, I'm going to

8    kill him.  The other inmates would talk him down.  Hey, leave

9    it alone.  Leave it alone.  For a while, that helped.  But,

10   finally, in the time frame leading up to May 26, 2005, and the

11   days before this, there was something that the defendant could

12   not walk away from, could not let go, and that was this.  After

13   Mr. Joiner again tells him to check in, the defendant sees

14   Mr. Joiner talking to James Duckett.  James Duckett and the

15   defendant were good friends.  They were friends.  And he sees

16   Mr. Joiner talking to Duckett, and Mr. Duckett later tells the

17   defendant what it was about.  He says, "Joiner wants to take a

18   long walk with me and have a talk."  The insecurity the

19   defendant has been feeling all along comes to a head, and he

20   decides, well, I'm going to get him.  I'm going to get him.

21   And he does.

22         And so the defendant decides he's going to get

23   Mr. Joiner, and he makes a plan.  Part of his plan involves

24   Mr. Duckett because, ladies and gentlemen, you will hear that

25   the defendant knew that he couldn't take Mr. Joiner on his own.

1   He knew it.  Again, insecurity.  So he needed an insurance

2   plan.  It wasn't going to be a one-on-one fight.  This was

3   going to be a one-on-one fight until it looked like the

4   defendant couldn't take Mr. Joiner, and if he couldn't take

5   him, Mr. Duckett would help.  He and Mr. Duckett agreed to

6   that.

7           So on May 26, 2005, Mr. Joiner comes home from work,

8   goes to his house in the K-Unit, goes to take a shower, and

9   Dominic Stewart, the defendant, confronts him.

10          You're going to hear that the defendant and

11  Mr. Duckett lived on the top tier of this level and down there

12  by the showers on the bottom tier.  You will hear that's

13  unusual; that upper-tier inmates don't shower on the bottom

14  tier.  They shower on the upper tier.  Mr. Duckett was down

15  there by the shower with his stuff.  It was all part of the

16  plan.  Mr. Duckett was there as insurance in case the defendant

17  can't take Mr. Joiner.

18          So the defendant and Mr. Joiner get into a

19  confrontation in front of the showers on that lower tier.

20  Words are exchanged.  Finally, the defendant reaches out with

21  his hand, places it right here in Gregory Joiner's forehead.

22  And Mr. Joiner, having walked away several times during the

23  beginning of this altercation, doesn't walk away that time, and

24  he swings at Mr. Stewart.  He does.  Mr. Joiner backs the

25  defendant up.  He backs him up.  He's throwing punches.  He's

1  handing some of the punches.  He's backing the defendant away

2  from him.  Bear in mind the defendant has come at him first.

3  He's backing him up.  Mr. Joiner is winning.  So what happens?

4  The insurance plan kicks in.

5          Here comes Mr. Duckett, ladies and gentlemen.

6  Mr. Duckett comes from behind Gregory Joiner, and he grabs him.

7  He grabs him, gets one arm around his neck, gets the other arm

8  around his body so Mr. Joiner can't fight him, Mr. Joiner can't

9  throw punches, Mr. Joiner pinned to his side.  He's

10  incapacitated, and Mr. Duckett will tell you that.  That's what

11  he did.

12          Mr. Duckett will tell you as he's getting his arm

13  around Gregory Joiner's neck, Gregory Joiner is fighting him.

14  He's pulling his chin down so Mr. Duckett can't choke him.  In

15  fact, Mr. Joiner was successful in that.  Mr. Duckett wasn't

16  able to choke him, but he was able to hold his only defense

17  down, his hands and fists.  So his hands and arms are pinned to

18  his side by James Duckett, and the defendant seizes the

19  opportunity to continue on with his plan to get Gregory Joiner,

20  and he does.  He punches him a lot.  He's hitting his head.

21  He's landing blows, loud, hard blows to Gregory Joiner, and at

22  the time that the defendant is originally hitting Gregory

23  Joiner, he's got a pair of workout gloves.  He has a shirt on,

24  gray sweatshirt, has workout gloves on.  He's hitting Mr.

25  Joiner and hitting Mr. Joiner, and it's just not getting it

1    done.

2         So you will hear how Mr. Stewart took a step back and

3    he looked at those gloves, like, it's not getting it done, and

4    he peeled them off, and then he went back at Mr. Joiner again.

5    And he continues hitting Mr. Joiner without the gloves on,

6    again, with Mr. Duckett holding him, and eventually Mr. Duckett

7    and Mr. Joiner go to the ground.  James Duckett is holding on

8    to Gregory Joiner and he falls backwards.  Gregory Joiner is

9    kind of on top of Mr. Duckett.  That doesn't stop the

10   defendant.

11        The defendant continues onward again with his master

12   plan.  This plan is he is taking care of Gregory Joiner.  He is

13   taking care of the man who has preyed upon his insecurities.

14   He is taking care of the person who told him to just check in.

15   He's going to take care of him.

16        And so once he's on the ground and the hands aren't

17   enough, he starts with the feet, and he's kicking him.  He's

18   kicking Mr. Joiner on the ground with Mr. Duckett holding him.

19   He's kicking him in the sides.  He's kicking him in the head.

20   He's kicking him in the neck.  He's kicking him anywhere he can

21   get at him, and Mr. Joiner cannot fight back.

22        Eventually, James Duckett lets go of Mr. Joiner

23   because Mr. Duckett recognizes that, hey, he's out.  He's

24   unconscious, and it's over.  It's done.  You got him.

25   Mr. Duckett lets go.  Gregory Joiner is lying on the ground.

1    And Mr. Duckett says to the defendant, hey, it's enough.  He's

2    done.  He's out.  He's unconscious.  He's on the ground.  He's

3    not getting back up.  He's out.  Mr. Stewart doesn't care.  The

4    defendant doesn't care.

5         While Mr. Duckett says to him, hey, stop it.  Stop it.

6    You're going to kill him, defendant says, Yep.  Yes, I am.  He

7    ain't getting up.  He's not getting up.  And he didn't get up,

8    ladies and gentlemen.  He didn't get up that day, he didn't get

9    up the next day, he never got up again.

10        So while James Duckett is trying to pull the defendant

11   off, he's telling him to stop, pulling on his shirt, getting

12   between them as Gregory Joiner is lying essentially unconscious

13   and lifeless on the ground, the defendant goes around him and

14   starts stomping.  You will hear about this stomping.  It is

15   brutal.  It is violent.  It is highly effective if you're

16   planning to kill somebody.  He is stomping up and down on

17   Gregory Joiner's head, on his neck.  Blood is coming out of

18   Gregory Joiner's face, out of his eyes, his ears, his nose, his

19   head.  And the defendant is still stomping.

20        James Duckett again tries again.  Stop it.  Pulls him

21   away.  And the defendant comes off for a few seconds, and goes

22   right back in stomping.  Three or four times, ladies and

23   gentlemen, defendant steps away or is pulled away from Gregory

24   Joiner.  Three or four times he makes the decision to go back

25   even though Gregory Joiner isn't moving.  Even though Gregory

1   Joiner is no threat to him.  Even though Gregory Joiner is

2   clearly, clearly not getting up.

3        You will hear, ladies and gentlemen, from the inmates

4   who were inside that unit.  You will hear from people who saw

5   what happened.  You'll hear about the sounds, the sights, and

6   they are graphic, and they are violent, and they are

7   descriptive.  You're going to hear about the injuries that

8   Gregory Joiner sustained; that by the time he got to the Pueblo

9   hospital, his brain was swelling to such an extent they

10  actually had to take off a piece of his skull to try to

11  alleviate the swelling.  While that was successful in the short

12  term, the injuries were life threatening and, in fact, Gregory

13  Joiner did succumb to the injuries.

14       You'll hear about the blunt force trauma to his brain,

15  the extensive injuries to his head, the injuries to the sides

16  of his neck and even to his ribs, all blows from the defendant.

17       Ladies and gentlemen, you may be thinking, well, where

18  are the guards?  This is a prison.  Where are the guards?  What

19  happened?  Why didn't they protect Mr. Joiner?  You're also

20  going to hear that things on the inside are different than

21  things on the outside where the guards can't just rush in to

22  save somebody.  This is ADX.  This is Administrative Maximum.

23  There are procedures in place through the Bureau of Prisons,

24  and those procedures are done every time, consistently every

25  time because they are for the safety and security of the

1   institution.  They are for the safety and security of the staff

2   and the inmates.

3           What you're going to hear is that when the range

4   officers -- and you'll learn about what the range is and where

5   the range officers were sitting -- when the range officers saw

6   there was a fight happening, they looked down range through a

7   grill.  There were only inmates on the inside of the grill.

8   The officers were on the outside.  They called emergency.  It's

9   called dialing deuces, 222, emergency, and that's exactly what

10  the guards did.  They also put on their armor.  Again,

11  emergency, we need help.

12          Again, what you'll learn when you're in prison in ADX,

13  when an alarm goes, everyone responds.  Everyone.  Not just

14  corrections officers.  Not just people who are in charge of

15  working with inmates, lieutenants, or command staff, but

16  administrative assistants, cooks, electricians; everybody in

17  the facility responds, because it's a threat to the safety and

18  security of the institution.

19          You're going to hear from all the people who responded

20  that day and what happened when they got down to the range and

21  the procedures they have to follow to get into the range.  You

22  see, they can't just go running into the range because they

23  don't know what the threat is at that point in time.  They

24  don't know if it's a setup.  They have to know what's called

25  getting the numbers.  They have to have the numbers so the

1    staff can go in safely to make sure they take care of the

2    situation.  That's exactly what they did.

3         While they're trying to get the numbers, you'll hear

4    the staffers screaming through the grill, stop it.  Stop it.

5    Get down.  Get down, at everything that's happening back in

6    that range, and it's not very far away.  The other inmates

7    heard it.  Everybody could hear it.  Stop it.  Get down.  But

8    their words were meaningless to the defendant because he had a

9    single plan.  He had a single purpose.  Nothing was going to

10   deter him from that, and that was he was going to get Gregory

11   Joiner, and he did.

12        The only thing you will hear that stopped the

13   defendant that day was the firing of an L-8.  You'll hear what

14   an L-8 is.  It is a nonlethal round, rubber pellets was shot

15   into the range, and that is what stopped the defendant.

16        In the end, the L-8 did what James Duckett could not,

17   and that was to end defendant's attack on Gregory Joiner.

18        Gregory Joiner was an inmate at the ADX.  He made

19   mistakes.  He was working his way in the step-down program just

20   like the defendant was, just like James Duckett was, trying to

21   get to a lower security level.  And, yes, he told the

22   defendant, check in.  Just check in.  He, essentially, brought

23   out the weaknesses in the defendant in front of other people.

24        Ladies and gentlemen, Gregory Joiner paid for that

25   with his life.  He paid for it with his life.  The defendant

1   was a simmering kettle of insecurity that Gregory Joiner played

2   on, and the fact of the matter is that when the defendant said,

3   he's not getting up, he's not getting up, he meant it.  He had

4   a plan.  He had a purpose.  He executed that plan.  He made the

5   decisions he needed to make, and he stomped Gregory Joiner to

6   death on the floor of that prison.  He stomped him to death in

7   his tennis shoes from landing up and down on Gregory Joiner's

8   head and crushing his skull.

9           Ladies and gentlemen, the evidence in this case is

10  difficult to listen to.  It is violent.  It is gory.  It is

11  bloody, but it is, in fact, what happened inside the ADX.  It

12  is life on the inside at the ADX, as it was for Gregory Joiner

13  on May 26, 2005, a day when Gregory Joiner went down and didn't

14  get up.  Once you've heard all the evidence, the United States

15  will ask you to return a verdict of guilty against the

16  defendant for the murder of Gregory Joiner.  Thank you.

17          *THE COURT:*  Mr. Hammond, will Mr. Stewart make his

18  opening statement now or exercise his right to defer opening

19  statement until completion of the Government's case in chief?

20          *MS. SIMONET:*  Your Honor, we will make a statement

21  now.

22          *THE COURT:*  Very well.  Counsel, Ms. Simonet, you may.

23                        **OPENING STATEMENT**

24          *MS. SIMONET:*  The Government is going to present this

25  case to you, ladies and gentlemen, to appeal to your emotional

1    side.  What you just heard about the stomping, the stomping,

2    the stomping, the hitting, the loud sounds, he's kicking him in

3    the head, he's kicking him in the body, he's punching him hard,

4    they're not going to play to your objective, analytical side.

5             We're going to ask you to listen to your objective,

6    analytical side.  They don't want you to listen to the

7    objective, analytical side of your brain because they want you

8    to be emotional about this and to forget about the facts of

9    this case.

10            Remember back to earlier this morning when the judge

11   said to you, the real question is can you decide this case with

12   your head and not your heart?  Ladies and gentlemen, that's

13   what we're going to ask you to do over the next two-and-a-half

14   weeks.

15            They use very specific words, a stomping.  What does

16   that do immediately?  It creates an image in your mind that you

17   can't get rid of.  It plays to your emotions, not to your

18   intellect, not to your analysis that your brain does about what

19   the facts of the case actually are.  If they appeal to your

20   emotional side, you can entirely forget the facts of this case,

21   but that's not what you have to do.  And the judge asked you if

22   you could decide this case with your head and not your heart,

23   and that's what you have to do.

24            So let's talk about the facts, because the facts are

25   important.  The evidence will show you that, yes, Dominic

1  Stewart, Gregory Joiner, James Duckett, and every other inmate

2  that was in that K-Unit at ADX back in May 2005 was looking

3  forward to getting through that program.  The conditions that

4  they live in there are incomprehensible to most people.

5  Anything is better than ADX, even a USP, a United States

6  penitentiary, which is a secure prison, is better than ADX.  At

7  least at USP you can breathe fresh air not through a cage.  You

8  aren't locked down in an 8-by-8 cell 23 hours a day where you

9  talk to no one except the guard who hands your food through the

10 door.  You can have contact with your family.  They can come

11 visit you at a USP.  You have freedom of movement within your

12 pod you live in.  That is not the existence of people who live

13 in the ADX.

14        When you go through the step-down program -- and

15 you'll hear a lot of testimony about that -- how hard those

16 people work in that program to remain write-up free, because

17 one write-up can set you back years in the program.

18        And when you get through that step-down program,

19 there's a sense of accomplishment for anybody who can get

20 through that program, because you know the good things that can

21 happen in your future if you can comply with the program and

22 get through and get out of there.  But one little error can

23 take it all the way for years.

24        Everybody in that unit has to believe that eventually

25 they'll get out of there and things will be better.  They'll

1   have more freedoms, they'll be able to communicate with their

2   family.  They can even start thinking about, can I go home to

3   my people, to my family.

4         Once you go through that program and start getting

5   progress, every inmate in there believes that eventually

6   they're going to get out of that godforsaken place they're in.

7   So everybody had those feelings in 2005 in the step-down unit

8   in ADX.

9         The evidence will also show you homicides are very

10  rare at ADX.  In fact, there's been two.  One of them is this

11  case.  This is the only one that's happened in the step-down

12  unit.  Why is that, that it's so uncommon?  Because everybody

13  there is trying their damndest to do everything they can to get

14  out of there.

15        That doesn't mean there aren't grievances that happen

16  between inmates because, certainly, there are.  People living

17  in close quarters, not the best conditions.  You never get a

18  break from the people you're around.  And sometimes those

19  grievances, no matter how petty they seem to us, become

20  important to the people that live in ADX.  And sometimes things

21  get out of control and fights happen.

22        Fights happen in ADX, and they also happen in the

23  step-down program.  And those fights are evaluated by staff and

24  security threats are evaluated, and that's part of the job of

25  the people that work there at ADX, and punishments are handed

1    out based on -- based on those things, such as loss of

2    privileges, of people's commissaries or loss of good time or,

3    again, the one that everyone fears the most is starting all

4    over again.  So years of your progress are taken away.

5          But a death, especially a death in the ADX, is a rare

6    thing, and it shouldn't happen.  Killings aren't supposed to

7    happen at the Supermax.  And when that does happen, that means

8    something terribly went wrong.  If you're the Bureau of

9    Prisons, I'm sure you're pretty sure you feel like you haven't

10   done your job by keeping other inmates safe and keeping other

11   staff safe.

12         There's another dynamic that's at work as well,

13   because fights do occur in prisons and they occur in ADX.  It's

14   pretty much a 50/50 chance that you get in a fight and somebody

15   gets a beat down.  Charges may not be filed as a result of

16   that.  It's part of prison life.  Happens in federal prisons

17   and state prisons all over this state and over the country.

18         The other thing that is not going to be surprising to

19   you is that ADX is full of people who aren't exactly angels.

20   It's full of people who have been convicted of violent, serious

21   offenses.

22         You're going to hear from a lot of inmates during the

23   course of this trial, and the large majority of them have some

24   type of conviction on their record for some type of homicide,

25   whether it's first-degree murder, second-degree murder,

1    voluntary, or involuntary manslaughter.  The ADX is full of a

2    lot of very violent offenders.

3         The evidence will show Gregory Joiner was transferred

4    to ADX because he had a terrible problem getting along with

5    people in prison.  Mr. Joiner himself was a very violent

6    offender.  In fact, Mr. Joiner threw his cellmate off a second

7    tier to his death in a facility that Mr. Stewart had also been

8    housed in.  After he threw his cellmate off the second tier, he

9    then went down to the first floor and continued to beat his

10   cellmate, even though his cellmate was dead.  Mr. Joiner was an

11   incredibly violent man.

12        The evidence will show you Mr. Joiner was a trained

13   boxer.  His weapons were hands.  He made no secret about what a

14   tough guy he was and about all the people he had hurt.  He was

15   an angry man who needed treatment and medication to deal with

16   his anger and mental health problems.  He was obsessive.  He

17   was paranoid.  He always thought that people were talking about

18   him, whether they were or not.  He took medication to stabilize

19   his moods, and even though everyone knew that this was a place

20   to belong or to behave, Gregory Joiner couldn't resist pushing

21   everyone's buttons.  He was an instigator.

22        The evidence will also show you that all of the

23   witnesses that are going to testify, especially the inmate

24   witnesses, have a motive here.  The BOP officials are going to

25   testify they did everything possible; sure, they're going to

1   say that, right.  They don't want to admit they have liability

2   here.  They don't want to be blamed for this fiasco that

3   happened.

4          The inmates that are going to testify, especially the

5   Government witnesses inmates, have their own motives.  You're

6   going to hear from a gentleman by the name of Thomas Malloy,

7   who also goes by Gator.  Mr. Malloy is a professional snitch,

8   and that's all he does.  He has a long history of getting

9   benefits for his cooperation, his testimony, his snitching.

10  He's had his sentence reduced for what is called substantial

11  assistance on numerous occasions, but he still continues to get

12  in trouble in prison.  You'll hear about that.  You'll hear

13  about his discipline problems.  You'll hear about his

14  continuing legal problems.

15         And he sought the assistance of the Government in this

16  case, but he hasn't come through yet.  He hasn't testified.

17  That's something that in the future another motion for

18  reduction of sentence, because he substantially cooperates,

19  will be filed.

20         Another inmate you'll hear from is a gentlemen by the

21  name of Kevin Guyton who also is looking for a benefit for his

22  cooperation.  Mr. Guyton has provided information to the

23  Government on previous occasions, not just this time.  He's

24  done it before, too.  Mr. Guyton actually stabbed a prison

25  guard at a facility he was at in California, and he knows how

1   to use the system to benefit himself.

2         And then we have Mr. Duckett, James Duckett, who you

3   heard about.  Until a week and a half ago, Mr. Duckett was also

4   charged in this case.  He was charged with second-degree murder

5   alongside Mr. Stewart and assault.  A week and a half ago,

6   Mr. Duckett struck up a deal with the United States Government.

7   The Government dismissed the second-degree murder count against

8   Mr. Duckett.  He's going to take the stand, and he's going to

9   testify against Mr. Stewart.  And he's going to get quite a

10  benefit, and you're going to hear about that.

11        And depending how he does, he's going to get a lot of

12  help from the Government.  He's going to get help for filing a

13  motion for sentence reduction and any special placement that he

14  needs.  And the Government is going to ask Mr. Duckett to talk

15  about a plan that Mr. Duckett and Mr. Stewart had to get

16  Gregory Joiner.  Think about Mr. Duckett's motive here and how

17  much he had to lose.

18        There were quite a few witnesses in the ADX when this

19  fight broke out, but the Government is going to only call three

20  or four of those inmate witnesses.  We're going to call

21  witnesses as well, other inmates at ADX at the time and are

22  there now.  Some are eyewitnesses.  Some of them aren't

23  eyewitnesses.  Some know things about other witnesses they're

24  going to be testifying about.  A lot of them will testify about

25  what it's like to live in ADX, how different it is from

1   anything that we can imagine, how everyone just wants to be

2   able to think about going home.

3          The other thing you need to know about is there is

4   ample evidence prior to May 2005 Joiner was constantly talking

5   smack behind his back.  He talked about him to other inmates

6   and talked to his face and was generally trying to create drama

7   around Mr. Stewart.  In the time pre2006 that Mr. Joiner did

8   that, Mr. Stewart walked away.

9          You heard about the check in.  It sounds like a simple

10  thing, right?  Check in.  It sounds very simple, but you're

11  going to hear testimony from inmates it's not simple.  That is

12  the absolute worst thing you can say to another inmate in front

13  of inmates.  It's absolutely the worst thing to say because

14  what it means is that the person who's saying it is saying, I

15  am controlling and dominating you, and you're mine.  I can do

16  whatever I want with you.  Check in technically means, you

17  better go into protective custody because you're mine.

18         It may not seem like a big deal to most people, but

19  when you live in that environment at ADX, that's everything.

20  It becomes incredibly dangerous and potentially deadly when

21  someone tells you to check in.

22         On May 26, 2005, Joiner came up to Stewart and,

23  according to Mr. Duckett, who was there, Joiner told Stewart

24  again to check in in front of other inmates.  This time Dominic

25  Stewart stood his ground.  He had had enough.  And depending on

1    who you'll hear from, you'll hear that Mr. Joiner said

2    something aggressive and angry toward Mr. Stewart, and as he

3    was yelling at Mr. Stewart, spit flew out of his mouth and hit

4    Mr. Stewart in the face.  Boom.  The fight was on.  That was

5    too much.  There was a flurry of punching and fists flying and

6    bodies struggling.

7         Some of the witnesses will tell you that Mr. Joiner

8    was, in fact, getting the better of Mr. Stewart and that

9    possibly Mr. Joiner had Mr. Stewart in a head lock at one

10   point, and just as suddenly as the fight started, James Duckett

11   jumps in, grabs Mr. Joiner, bear hugs him from behind, and the

12   two of them fall back to the ground.  When that happened,

13   Dominic Stewart hit Joiner, and he lost control.

14        The spit, the repeated threats, the verbal abuse,

15   check in, the heat of the moment of the fight combined in a

16   vortex, and it threw Dominic Stewart over the edge.  He lost

17   control.  He did.

18        And you heard about how, in the Government's opening

19   statement, the guards can't just rush in when there's a fight

20   going on.  It will be clear from the evidence there was yelling

21   and there were commands to stop and that a gun, this L-8, was

22   fired.  One shot was fired into the range, and, before that,

23   the fight was over.

24        You're also going to hear about whether or not there

25   were cameras.  Some people will say there were cameras on the

1   unit, but there is not a film for you to see.  Why not?  We

2   don't know.  It's unfortunate, because if we had had a camera,

3   then we could see the fight for ourselves.

4         There's a lot of cameras there now, and you'll see

5   pictures of the cameras, but there were not cameras to the

6   extent there are now at ADX.

7         What happened on May 26, 2005, was that Dominic

8   Stewart and Gregory Joiner got into a fight.  Joiner started

9   it, and Dominic Stewart finished it.  When Mr. Joiner told

10  Mr. Stewart one more time to check in and spit in his face and

11  threatened him and harassed him and demeaned him, Mr. Stewart

12  snapped.  The consistent fact was it was instantaneous, fists

13  were flying; that it was a fight.

14        Mr. Joiner is dead, and at the end of this case we are

15  going to ask you to return a verdict for manslaughter, which is

16  the facts of this case, not the emotion of this case, but the

17  facts.  And so please listen to the evidence with your

18  analytical part of your mind, with your head, not with your

19  heart, and return a verdict for manslaughter.  Thank you.

20        *THE COURT:*  Counsel, thank you.

21        Again, ladies and gentlemen of this jury, I remind and

22  instruct you that what you have heard from counsel from the

23  Government and counsel for Mr. Stewart during their respective

24  opening statements is not evidence and, therefore, may not be

25  used or considered by you as such.

 1          Would you please excuse counsel and the Court

 2    momentarily while we gather at my bench to discuss a matter

 3    momentarily.  I apologize for showering you with white noise.

 4    Counsel, my bench, please.

 5          (At the bench:)

 6          *THE COURT:*  Thank you, Counsel.

 7          First, Counsel for Mr. Stewart, do you waive his

 8    presence at the bench for the limited purpose of this discrete

 9    bench conference?

10          *MR. HAMMOND:*  Yes, Your Honor.

11          *THE COURT:*  Very well.  I direct your attention to the

12    clock.  As you can see, it's 4:35.  It's been a long day.

13    Ordinarily, it would be my inclination to call it a day and

14    dismiss the jury, commencing the evidence and testimony bright

15    and early tomorrow morning at 8:30 a.m., but after

16    Mr. Hammond's report, all of which I admit I did not

17    understand, is there any objection to proceeding on that basis?

18          *MR. HAMMOND:*  I'm sorry, Your Honor.

19          *MR. TROYER:*  No, Your Honor.

20          *MR. HAMMOND:*  I'm not sure what the report was.

21          *THE COURT:*  I thought your indication was that you

22    wanted to call a witness and to achieve certain information

23    that would permit the authentication of what I thought to be

24    proposed and eventual defense exhibits.

25          *MR. HAMMOND:*  That can certainly be done tomorrow, and

1  then I'd have an exhibit list for him to look at at the same

2  time, which would be eminently helpful to everybody.

3       THE COURT:  Very well.  Then we're through with day

4  one of this trial.  Thank you, Counsel.

5       (In open court:)

6       THE COURT:  Counsel, thank you.  Ladies and gentlemen

7  of the jury, thank you for your patience and indulgence.  After

8  conferring with counsel, this brings us to a conclusion of this

9  first day of trial.

10       You are not in shape for trial, but you will be in the

11  coming days.  Very well.  Momentarily, as I promised and

12  advertised, you will not be sequestered.  Instead, you'll be

13  free to leave separated and go your separate ways overnight.

14       First, two things.  Before you leave, store and leave

15  behind in your jury deliberation suite your note-taking

16  materials.  That will be a continuing requirement and order of

17  this Court.  Second, and perhaps more importantly, take the

18  time reasonably necessary to read and heed the important rules

19  that govern your conduct, communication, and deportment as

20  jurors in the trial of this case.

21       Now, I propose that we reconvene trial tomorrow

22  morning at 8:30 a.m.  First, let me inquire, will that be

23  unreasonable or terribly inconvenient for any one or more of

24  you ladies and gentlemen of the jury?  Apparently not.  We'll

25  proceed on that basis.

 1          Therefore, as concerns this case and trial, we are in

 2     recess until tomorrow morning at 8:30 a.m.  Good evening.

 3          (Court stood in recess at 4:38.)

 4                              **INDEX**

 5     **Item**                                                    **Page**

 6     OPENING STATEMENTS

 7       By Ms. Knox                                               198

 8       By Ms. Simonet                                            210

 9                          *  *  *  *  *

10                     **REPORTER'S CERTIFICATE**

11          I certify that the foregoing is a correct transcript from

12     the record of proceedings in the above-entitled matter.  Dated

13     at Denver, Colorado, this 17th day of September, 2012.

14

15                              *S/Tracy Weir*
                                Tracy Weir
16

17

18

19

20

21

22

23

24

25