1

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

3

Criminal Action No. 10-CR-00129-REB

4

UNITED STATES OF AMERICA,

5

    Plaintiff,

6

vs.

7

DOMINIC D. STEWART,

8

    Defendant.

9

_____

10

REPORTER'S TRANSCRIPT
(Sentencing)

11

_____

12

13

14

        Proceedings before the HONORABLE ROBERT E. BLACKBURN,

15

Judge, United States District Court for the District of

16

Colorado, occurring at 11:03 a.m., on the 8th day of June,

17

2012, in Courtroom A1001, United States Courthouse, Denver,

18

Colorado.

19

20

21

22

23

24

Proceeding Recorded by Mechanical Stenography, Transcription
    Produced via Computer by Tracy Weir, 901 19th Street,
      Room A258, Denver, Colorado, 80294, (303) 298-1207

25

1                         *   *   *   *   *

2                         APPEARANCES

3           ROBERT TROYER and SUSAN "ZEKE" KNOX, Assistant U.S.

4    Attorneys, 1225 17th Street, Suite 700, Denver, Colorado,

5    80202, appearing for the plaintiff.

6           THOMAS J. HAMMOND, Attorney at Law, Thomas J. Hammond,

7    P.C., 955 Bannock Street, Suite 200, Denver, Colorado 80204,

8    appearing for the defendant.

9           FRANCES SIMONET, Attorney at Law, 1544 Race Street,

10   Denver, Colorado 80206, appearing for the defendant.

11                         **PROCEEDINGS**

12           (In open court at 11:03.)

13           *THE COURT:*  Good morning, and thank you.  Please be

14   seated.

15           As set, this is case 10-cr-00129, identified for our

16   purposes this morning as United States of America versus

17   Dominic D. Stewart, defendant.

18           The matter comes before this Court now for sentencing.

19           Commencing with the Government and transitioning to

20   the defense, ladies, gentlemen, may I have your appearances,

21   please.

22           Mr. Troyer.

23           *MR. TROYER:*  Yes.  Good morning, Your Honor.  Bob

24   Troyer and Zeke Knox for the United States.  With us today is

25   Special Agent Johnny Grusing from the FBI.

1          *THE COURT:*  Lady, gentlemen, good morning.

2          *MS. KNOX:*  Good morning, Your Honor.

3          *THE COURT:*  Mr. Hammond.

4          *MR. HAMMOND:*  Good morning, Your Honor.  I'm Tom

5     Hammond on behalf of Mr. Stewart.  Along with me is my

6     co-counsel, Fran Simonet.  Mr. Stewart is seated to my left in

7     custody.

8          *THE COURT:*  Lady, gentlemen, good morning.

9          *MS. SIMONET:*  Good morning.

10         *THE COURT:*  Importantly and relevantly, probation

11    officer Justine Kozak is also present.  Good morning.

12         *MS. KOZAK:*  Good morning.

13         *THE COURT:*  Assuming we are prepared to proceed to

14    sentencing as stated and understood by the Court, I find and

15    conclude relevantly as required by 18 U.S.C. Section 3552 and

16    Federal Rules of Criminal Procedure 32, the probation

17    department has conducted a presentence investigation and has

18    filed a presentence report which now includes two addenda.

19         Let the record reflect that I have received, read, and

20    reviewed, hopefully carefully, the presentence report, now

21    docketed as No. 532, and its two concomitant addenda.

22         Has the Government, Mr. Troyer?

23         *MR. TROYER:*  We have, Your Honor.

24         *THE COURT:*  From the perspective of the Government,

25    are there any matters of a material or substantive nature not

 1   now of record?

 2          *MR. TROYER:*  No, Your Honor.

 3          *THE COURT:*  Thank you.

 4          Mr. Hammond or Ms. Simonet, a series of related

 5   questions.  First, Counsel, have you read the presentence

 6   report and the corresponding addenda?  To your knowledge, has

 7   Mr. Stewart done the same and, third and most importantly, have

 8   you reviewed and discussed the presentence report and its

 9   addenda carefully and thoroughly with Mr. Stewart?

10          *MR. HAMMOND:*  Yes, yes, and yes.

11          *THE COURT:*  Very well.

12          *MR. HAMMOND:*  One of the reasons why our response -- I

13   think it's in the motion.  One of the reasons why our response

14   was somewhat tardy is we had a little bit of difficulty getting

15   down to the Administrative Maximum and going over the

16   presentence report with Mr. Stewart, but that did happen.

17          *THE COURT:*  From the perspective of the defense, are

18   there any matters of a material or substantive nature not now

19   of record?

20          *MR. HAMMOND:*  No, Your Honor.

21          *THE COURT:*  Very well.  Thank you.

22          Also pending relevantly before the Court concerning

23   sentencing is Dominic Stewart's sentencing statement, document

24   531, filed June 3, 2012, and its concomitant attachments 1

25   through 12, also identified alphabetically as Exhibits A

1   through L.

2        Very well.  To counsel for Mr. Stewart, I return to

3   you to inquire, as I must.  Do you wish to make a statement on

4   behalf of Mr. Stewart, offer additional information in

5   mitigation of sentencing, comment further on the various

6   determinations, calculations, and recommendations of the

7   probation officer, and be heard on matters relating to the

8   appropriate sentence?

9        *MR. HAMMOND:*  Yes, we do, Your Honor.  I would like

10  to, with the Court's permission, proceed after the Government

11  goes first.

12       *THE COURT:*  Permission is denied.  You may proceed

13  now.

14       *MR. HAMMOND:*  I had a feeling you might say that.

15       Your Honor, this case is very difficult for me for a

16  number of reasons.  I think the Court is well aware that most

17  of the homicide charges and homicide cases that are tried

18  across the country are tried in the state courts, not the

19  federal courts.

20       It strikes me as very interesting.  The distinction

21  between the United States Code, for example, and the Colorado

22  criminal code, there is a difference not between first-degree

23  murder, first-degree murder in the state system is life without

24  parole.  First-degree murder in the federal system is life

25  without parole.  Second-degree murder, however, has a huge

1    chasm of difference between the state and federal system.

2          In the state system, if Mr. Stewart were charged under

3    the Colorado statutes, he'd be looking, basically, at a

4    sentence in the aggravated range, because he's in custody, of

5    24 to 48 years.  In the federal system under the United States

6    Code, the statutes state that he can be sentenced to any term

7    of years up to life without parole.

8          That's difficult for me to comprehend in that context,

9    Your Honor, because it makes the line very, very fuzzy, as

10   you've seen in the presentence report and recommendations,

11   between first-degree murder and second-degree murder.

12          I think that -- well, we know there's a purpose for

13   the distinction between first and second-degree murder.  It

14   starts with the mental state, and because of the mental state,

15   it proceeds to how sentencing should be handled.  I think

16   that's one of the issues that we have here today.

17          As I've stated, in the sentencing statement on behalf

18   of Mr. Stewart, there are a number of things I'd like to say.

19   They don't have, they don't weigh on a sentencing guideline

20   calculation primarily because Mr. Stewart has been identified

21   as a career criminal and, therefore, his criminal history

22   category is VI, the highest criminal history category he can

23   have.

24          He comes to the Court at an offense level of 40.  The

25   guideline calculation is 360 months to life.  I'm going to,

1    obviously, ask this Court to impose a sentence of 360 months.

2    I'll give you a number of reasons why.

3         One of the difficulties I've had in preparing for this

4    sentencing and responding in writing as required to the Court

5    is that on a guideline calculation the acceptance of

6    responsibility that I believe that Mr. Stewart has engaged in,

7    he's never denied for a minute that his actions did not

8    ultimately result in the death of Gregory Joiner.

9         While I believe he has accepted responsibility, on a

10   guideline calculation, that doesn't mean anything because at a

11   40, he'd have to get down to, I believe, level 35 before the

12   sentencing guideline is less than 360 months to life.  If I

13   recall correctly, offense level 36 to 43 is 360 months to life.

14        And, yet, I do believe that in this court, in this

15   courtroom, for this Court, and for every Court, that any judge

16   wants to know whether or not the defendant has accepted

17   responsibility.  I think in that context whether or not he has

18   accepted -- he has expressed remorse.

19        That's one of the reasons why there's so much -- so

20   many more attachments than I would normally put into a

21   sentencing preparation.  I think -- I know the Court has read

22   all those attachments, and I am sure that the Court understands

23   the evolution and development of Mr. Stewart's thoughts in the

24   days immediately following this incident.  I think it's fairly

25   easy.  I'm going to try to summarize these as briefly as I can.

8

1   I know the Court is aware of this.

2         Mr. Stewart, on about May 30th, wrote a letter to

3   a woman named Kim Perry.  I think, you know, it's always

4   possible that somebody can say, well, you know, this is fine

5   and this is all well and all this stuff, but he knows the BOP

6   is reviewing all this stuff, and he's trying to set up his own

7   mitigation within moments after the fight happened.  I don't

8   believe that for a second, not with this young man, not for a

9   minute.

10        If he had a plan to mitigate everything, he would have

11  phrased these letters, I think, in an entirely different

12  manner.  What he tells Ms. Perry is, in the second paragraph,

13  "I'm in the hole.  I was in a fight and they're turning this

14  into something serious because I stomped the dude."  Later on

15  he said, "I've been beaten and I've seen other inmates beaten

16  worse than this dude that I whupped and the police never got

17  charged with attempted killing or anybody else.  I pray it

18  don't come to that.  All these years I looked at and had.  Now

19  they're going to revoke -- they're going to make out to me

20  being more violent, even more violent because of a fight."  And

21  then "I know I've let a lot of people down.  I'm tired of

22  living like this.  I'm tired."

23        And that follows in the second attachment, which I

24  think is one of the most telling.  Again, dated May 30th.

25  Before Mr. Stewart -- before Mr. Joiner died, so before

1  Mr. Stewart knew Mr. Joiner was going to die.  First letter is

2  dated May 25th to his dad.  He says, "I'm very disappointed

3  in myself about a lot of things.  I have lost a lot of

4  discipline and patience to where I'm feeling like where we had

5  our last visit down at Lorton my soul still screams about how

6  people just dishonored me, a wound that will never heal."

7       He has another letter to his dad that he finishes at

8  the end of this.  He sends a letter to his grandmother, Lily

9  Stewart, who I met in 2009.  He reminds her in this letter of

10  what she reminded him, and she said to him, "Do you want to

11  make it home while I'm still alive?"  As he goes through this

12  letter, he says, "It looks like I won't be coming close to

13  coming home anytime soon.  I got into a fight.  Sometimes I

14  feel cursed Gma like I'm trapped in the grips of hell."

15       And then he writes his mother on May 30th and

16  says, "Once again, my mother, I've let you down."  This isn't

17  somebody who's making a plan, mitigation statement to the

18  Government or to the Court.  This is a man who is writing his

19  family, acknowledging his actions, and understanding the people

20  that he's hurt.

21       "It was justified, but I feel your pain.  I hate that

22  part of me that hurt you so much, that part that burdens you so

23  much because I am your first and I have tortured you as well as

24  myself and these bowels of this belly of a beast."

25       Finally, he writes the second letter to his dad.  He

1   says, "I'm in the hole.  I must be cursed or something.  All I

2   have worked for is gone."  And I know that this Court knows

3   that at the time this happened, Mr. Stewart had seven years of

4   clean conduct, no write-ups, and he was dedicated and committed

5   to getting through that program.  He was dedicated and

6   committed to showing everybody that he had a chance to get out

7   of the penal system itself.

8            "All I've worked for is gone and the institution

9   serves me a shot at an attempted killing.  I'm thinking that

10  this is going to go political because a dude just got stomped

11  to death, like, two months ago."  He's referring to the other

12  homicide that occurred in the ADX.  "All this was was a

13  fistfight.  I don't understand how this went down."  And the

14  mother's, "All I have done to prove I have changed now just

15  seems like a front.  Forgive me, father, for trouble seems to

16  search and find me.  God knows best.  For seven years I've been

17  ducking and dodging fools, but maybe the only fool I was

18  ducking and dodging was my very self."

19           Those are the words of a man who's trying to come to

20  terms with himself, his history, the dramatic turn of events,

21  which I respect the jury's verdict, Your Honor.  I will always

22  think of this as a manslaughter case, and always believe

23  Mr. Stewart snapped primarily because of the seven years of

24  good conduct.

25           He sent another letter to Ms. Perry on June 22nd

1    after he found out that Mr. Joiner had died.  "I'm in the hole,

2    and I was involved in a fight where a man was seriously injured

3    and six days later he died from those injuries.  As a man

4    holding on to the rope of righteousness, the principles of all

5    Islam, my grip slipped and in the heat of passion I took

6    another man's life.  Something I truly regretted once it was

7    over.  I have misrepresented Islam and I am ashamed in every

8    way especially in the eyes of God.  I know I'm not guilty of

9    murder of either first or second degree murder and I'll admit

10   I'm guilty of voluntary manslaughter, but because of my record

11   I think that's not the way they're going to treat me.

12   Everything is in God's hands.  I can't change what happened.  I

13   just pray and ask for forgiveness and strength.  I know I hurt

14   and disappointed you.  This is what I wanted to deliver to

15   Rhameek."  Rhameek is Ms. Perry's son.  "This place is nothing

16   but negativity and it will swallow a man whole."  At the very

17   end of the letter, "Rhameek has a perfect example of the

18   consequences that street life and the dangers of prison life

19   are in me."

20        It is certainly not a justification for what

21   Mr. Stewart did, but it is an interesting comment that he is

22   trying to reach out to someone through someone else to say,

23   stay off the streets, do what you're doing, stay in school, get

24   the job done in a way I didn't do.

25        On June 29th, he wrote his grandmother, Lily

1    Stewart, again.  I think the most telling comment in that

2    letter is the statement that he says, "It hurts me a thousand

3    times more because I know I have hurt you all.  It's not for me

4    to understand, but whatever the course my ship takes it was

5    God's way and, God willing, knows I didn't ask for this.  But a

6    man's life is gone, and his family is hurting, especially his

7    mother and his family."

8         That is not the, I don't believe -- and I suppose my

9    opinion isn't all that important -- but that doesn't sound to

10   me like somebody who intentionally wanted to kill somebody.  It

11   sounds to me like somebody who got in a fight, he did what he

12   did, and he lost it.  And that's what happened.

13        In turns of remorse and acceptance of responsibility,

14   also, Your Honor, attachment E is a letter from David Law, the

15   chaplain's assistant at the ADX religious services written to

16   Mr. Stewart on July 8, 2005."  I apologize for not getting back

17   to you, sir.  I have thoroughly investigated your request to

18   write the family of Mr. Joiner.  I am sorry but the

19   administration at this time" -- he omitted time -- "will not

20   allow you to do so for various reasons.  I will gladly stop by

21   this weekend and talk with you.  Chaplain Keith is not going to

22   be here this weekend.  I am sorry I could not be of more help

23   to you on the letter issue, but if we can help you with

24   anything else, let us know."

25        Those, Your Honor, are the writings of a man and the

1   expressions of a man and communication of a man who, I believe,

2   has accepted responsibility and has genuine remorse for what

3   happened on May 26, 2005.

4          In that context, Your Honor, I want to try to give a

5   little bit of color to Dominic Stewart's life.  It is a violent

6   life.  He lived in a place -- when I visited his grandmother

7   and his mother and a host of family members in Washington, DC,

8   when we were thinking this was going to be a death penalty case

9   and looking to do some mitigation, they live in a place that's

10  outside of the District itself in Anacostia.

11          *THE DEFENDANT:*  Yeah.

12          *MR. HAMMOND:*  I had to buy three maps of Washington,

13  DC, because two of them don't have Anacostia on the map

14  because, apparently, that's not where tourists are supposed to

15  go in Washington, DC.  It is a place that is still difficult.

16  It's nothing, nothing like it was in the mid '80s and early

17  '90s.

18          We went to the school where Dominic Stewart was when

19  he was in middle school.  From all accounts in the mid '80s

20  and early '90s, the neighborhood can be described fairly as a

21  war zone.  It was completely changed, completely gentrified in

22  2009.  You wouldn't know of the things that had gone on there.

23          I think the Court's probably aware that's a time --

24  somewhere in that time around about 1985 and 1993 that

25  Washington, DC, had the dubious distinction of being the murder

1    capital of the world.

2            I'm not trying to make this as an excuse, Your Honor.

3    I understand that there were lots of black men who were in

4    Washington, DC, during that time and did not engage in any acts

5    of violence.  I understand that.  But I suggest to the Court

6    that Mr. Stewart's circumstances were very difficult to deal

7    with, and I think it is -- stands in mitigation at sentencing.

8            His mother has had a host of health problems.  There

9    was a time that Mr. Stewart, during the course of litigation in

10   this case, wanted to go as far as he possibly could to help his

11   mother to survive what is certainly a terminal illness.  She

12   has dramatic lung problems, dramatic heart problems, and I

13   don't know how much longer she has.  He has that ability.

14           The Court knows from some of the letters written on

15   his behalf when he was at Lorton that there were even officers,

16   corrections officers, who wrote letters on his behalf when he

17   was, I believe, 17 years old.

18           Lorton is a place that could be fairly well described

19   as hell.  There is an article written in the Washington city

20   paper.  I think it was in the early '90s, if I recall

21   correctly.  I'm sorry.  It was late '90s.  June 6, 1997, when

22   they talk about the hole is at the end of the line at the end

23   of the line.  They talk about the massive amount of violence

24   that went on in that prison even though it was called the

25   Lorton Reformatory for Youth.

1          The violence, uncontrolled violence, that occurred at

2   Lorton Reformatory was so significant that international groups

3   appealed to the Department of Justice to investigate, and the

4   Department of Justice closed the facility.  This is where

5   Dominic Stewart was when he was 17 years old.

6          So they moved him.  They moved him to the prison

7   called Red Onion further in Virginia.  Interestingly enough,

8   Red Onion was also closed by the Department of Justice for the

9   human rights violations that occurred there.  Both places.  And

10  in that context the Department of Justice had a commission to

11  determine what to do with the prisoners who had been housed in

12  Lorton and at Red Onion.  Mr. Dominic Stewart at an early age,

13  a very young age, was designated to the United States

14  Penitentiary Administrative Maximum when he was in his early

15  20s.

16          I understand, Your Honor, that there are people who

17  say, well, there was a reason for the designation.  It was for

18  all the things that he had done.  I suggest that there were a

19  number of things that were done to him in Lorton and in Red

20  Onion that we don't know about.  I don't even know how to get

21  ahold of some of those records.  But there were fights.  There

22  were beatings.  There were stompings.  It's obvious reading and

23  reviewing some of the documents about Lorton and Red Onion that

24  the guards were just as involved as the inmates, and that's one

25  of the reasons both facilities were closed.  So he comes to the

1    ADX.

2           Seven years of clean conduct.  Seven years of clean

3    conduct.  And I think, with the Court's permission, one of the

4    most telling things are some of the phone calls that he -- that

5    Mr. Stewart engaged in.  In the time he was informed he was

6    going to be able to go to the -- get into the step-down unit

7    and what he would be able to do if he got into the step-down

8    unit, that he had, for the first opportunity I can remember in

9    his life, he was going to get an opportunity to show what he

10   could do and get out of the Administrative Maximum and to --

11   and to get either into a different facility or maybe even an

12   FCI or maybe a camp or maybe get released from prison.

13          On April 2nd, 2005 -- I'm sorry.  It was

14   April 8th.  He called his dad, and in the context of that

15   telephone conversation, he said, "Look.  Don't tell anybody,

16   but I've got a chance here.  I could be out to a camp in five

17   years if I maintain clear conduct and I go through this

18   program.  They said I can do it.  Don't tell them.  I don't

19   want to give them false hope.  I got a chance."

20          He spoke about that to a number of people in the early

21   years, in the early time before, obviously, May 2005.  Talked

22   about what he had to do to make sure he stayed in the program

23   and he had to get help to get money to pay monthly restitution

24   payments so he wouldn't get kicked out of the program.

25          One of the last conversations he had before this

1   happened was with this woman, Kim Perry, and he explained that

2   his hope -- and he explained it to his dad and mom as well.

3   His hope was to get to Lewisburg or Allenwood because that

4   would be closer to him and then he could get some visits but

5   it's too far to get out here.

6        There are some 30 -- the Government provided me with

7   39 phone calls.  There are, in those 39 phone calls, a number

8   of phone calls, including one on July 6 to his mom in which he

9   said he's okay but he was disappointed because he's going to be

10   facing murder charges.

11        The what I would call pain and anguish of not getting

12   calls but making calls and learning what's going on at home and

13   the frustration that based on what he has done and where he has

14   put himself he cannot help; that he had, I believe, a cousin

15   who was raped in DC; that his grandmother, Lily Stewart, had to

16   sell the house that he, basically, grew up in with a number of

17   other family members, and the desperation of things that could

18   not have had a hand in the reshaping and redefining, his mother

19   continuing to smoke cigarettes as much as he would ask her and

20   beg her not to, call after call after call related to family

21   and trying to show that he was really going to get through

22   this.

23        The most amazing one -- and with the Court's

24   permission, I'd like to play this one -- is one to his

25   grandmother.

1        (At this time a phone call was played for the Court.)

2        *MR. HAMMOND:*  I'm not going to play the remaining nine

3   minutes, Your Honor, but that's one example of Mr. Stewart and

4   the recognition and the hope in five months from May 2, 2005,

5   of being able to get out of the United States Penitentiary

6   Administrative Maximum.  The following day he has a

7   conversation with Kim Perry in which he says the same thing, it

8   will be possible for him to leave in five months.

9        As late as 5-20-2005, six days before the fight, this

10  is to his dad, Larry Logan.  "I might be leaving sometime this

11  year.  They have to see if I'm ready.  Four more months.  I'm

12  going to get closer to home."

13       Those are -- it's easy to paint Mr. Stewart as a

14  violent -- because this involved kicking and stomping --

15  sadistic human being who has no feeling, no emotions who is a

16  cold-hearted killer, and yet that would be an incorrect picture

17  of Mr. Stewart.

18       He had, as did Mr. Joiner, all the incentive in the

19  world to keep going, to keep going, to ignore the stuff that

20  was going on, that continuously goes on in Administrative

21  Maximum, even in the K-Unit.  He was trying.  He was working.

22       He, at some point, changed his religion to become a

23  Muslim, and in the time that I've known him -- and I think the

24  Court knows this.  I met Mr. Stewart the first time in

25  November 2007, long before he was indicted in 2010.  As long as

1   I have known him since 2007, he has been one of the most

2   religious and pious men I've ever met.  I think his religion

3   keeps his sanity together in a place like Administrative

4   Maximum.

5        He has been in solitary confinement in a one-person

6   cell for as long as I've known him.  I would love to give the

7   Court some kind of example of what it's like to live in

8   solitary confinement 23 hours a day, seven days a week as it is

9   in the Administrative Maximum at the ADX.  I know the Court

10  knows that.  I know the Court is aware of that.  I'm sure the

11  Court has read the effects -- and they've been published

12  recently in major newspapers -- the effects of solitary

13  confinement do not get the job done.  They didn't get the job

14  done for Mr. Stewart either.

15       I know that the Court talked about Mr. Duckett at

16  Mr. Duckett's sentencing and said but for Mr. Duckett's actions

17  none of us might be here today.  I know Mr. Duckett pled to

18  assault.  I know Mr. Duckett got a 40-month sentence, and I

19  believe that was the terms of the plea agreement.

20       The Court also made a point of stating that

21  Mr. Duckett's testimony was largely uncontroverted, and, with

22  respect, Your Honor, there are a couple things I would like to

23  disagree with that I believe took Mr. Duckett's testimony into

24  question, and I think that is one of the reasons why the jury

25  did return a verdict on second-degree murder as opposed to

1   first-degree murder.

2       Mr. Duckett managed to put himself in a place he could

3   not possibly have been, running up and down the stairs of the

4   tier to the second floor some two or three times.  There were a

5   number of things -- I believe it came up in closing argument --

6   about 17 different things Mr. Duckett said that could not

7   possibly have been true.

8       I'm not going to belabor all of them here, but I think

9   Mr. Duckett's testimony was, certainly, self-motivated.  He had

10  a lot to gain by that.

11      There is some -- it did not come out in evidence.  I

12  apologize.  I think there is some evidence Mr. Duckett was on

13  his own mission in May 2005, separate and apart from Dominic

14  Stewart.

15      Mr. Stewart is still in custody in solitary

16  confinement in the controlled unit at Administrative Maximum,

17  and, yet, even today he still prays, he still exercises, he

18  still tries to improve whatever life he has to the degree he's

19  studying Spanish, trying to become fluent in Spanish, and do

20  whatever he can to improve his mind.

21      I bring these facts to the Court in mitigation.  I do

22  not ask for a sentence that is a variant sentence or sentence

23  outside of the guidelines, but I do ask the Court consider a

24  sentence of 360 months as opposed to life.  It will give

25  Mr. Stewart an opportunity to have some hope.  It will also

1    satisfy all the requirements of 18, United States Code, 3553.

2    It certainly punishes Mr. Stewart and takes into consideration

3    all the facts in Mr. Stewart's criminal history in mind.

4          Odds are, even with 360 months, he probably won't get

5    out of the United States Penitentiary system and probably not

6    even the Administrative Maximum, and he will continue to be in

7    a single cell by himself everyday for at least that period of

8    time.  That is a very, very strong and harsh punishment.

9          He has -- Mr. Stewart has mitigating factors that he

10   brings to this courtroom.  The Court is now certainly aware

11   from the letters and -- I could have played some of the

12   recordings -- the remorse and the acceptance of responsibility

13   and the disappointment that he felt in 2005 and still has to

14   wrestle with today and everyday for the rest of his life.

15         I imagine that the Court or counsel or anyone can say,

16   well, that's all fine, Mr. Hammond, but he's alive and

17   Mr. Joiner is dead.  That's the end of the story.  I

18   respectfully submit that that is true, but he was not found

19   guilty of first-degree murder.  He was found guilty of

20   second-degree murder, and regardless of how I feel, the verdict

21   the jury returned was second-degree murder, and I think the

22   sentence should reflect second-degree murder consequences as

23   opposed to first.  I would ask that the sentence be 360 months.

24         *THE COURT:*  Counsel, thank you.

25         *MR. HAMMOND:*  Thank you.

1        Mr. Stewart, before I impose sentence on you in this

2    proceeding, you first have the legal right and opportunity now,

3    right now, if you choose -- I'll wait until you've poured the

4    glass of water.  What I have to say is important.

5            *THE DEFENDANT:*  I can hear you.  Okay.

6            *THE COURT:*  Let me repeat.  Before I impose sentence

7    on you today, you first have the legal right and opportunity

8    now, if you choose, to make your own statement to this Court

9    and/or to offer additional information in mitigation, lessening

10   of that sentence.  Let me ask, do you wish to make any such

11   statement and/or offer any such statement in mitigation?

12           *THE DEFENDANT:*  Yes.

13           *THE COURT:*  Very well.  You may.  Would you, and at

14   least one of your co-counsel, if not both of them, please

15   report to the podium, please.

16       Mr. Stewart, before I receive your anticipated

17   sentencing statement, which we know as allocution, please first

18   raise your right hand to be sworn by this Court.  Thank you.

19           (At this time the defendant was sworn.)

20           *THE DEFENDANT:*  Yes, sir.

21           *THE COURT:*  Mr. Stewart, now under oath, what is it

22   you would tell the Court?

23           *THE DEFENDANT:*  First, I want to apologize.  My shirt

24   is soaking wet.  It's kind of cool in here.  I'm shivering a

25   little bit.  But I'll try to be brief.  I just want to finally

1    get a chance to express myself for y'all to hear my voice,

2    but -- let me see.  What is that word you use?  Uncontroverted

3    testimony, right?  That's what you told my lawyer, Mr. Hammond,

4    that Duckett testimony was uncontroverted?

5            THE COURT:  I didn't tell him.  I entered formal

6    findings and conclusions during the formal sentencing of your

7    co-defendant, Mr. Duckett.

8            THE DEFENDANT:  That word means what?  Basically -- is

9    it -- basically, the truth.  Basically, it don't has -- can't

10   be defended as far as, like, what he say in his testimony is --

11   it has no holes in it and it's taken as the truth.  That's what

12   I'm asking you.  That's what the word means?

13           THE COURT:  Mr. Stewart, this is not your opportunity

14   to ask questions and the opinions of the Court.  This is your

15   important opportunity --

16           THE DEFENDANT:  Okay.  I understand.  Excuse me.  I

17   understand.  I understand.

18           THE COURT:  Mr. Stewart.

19           THE DEFENDANT:  I just want to --

20           THE COURT:  Mr. Stewart, please don't interrupt the

21   Court.

22           THE DEFENDANT:  I'm sorry.

23           THE COURT:  It's rude, and Ms. Weir cannot report two

24   of us talking at the same time.

25           THE DEFENDANT:  I apologize.

1        *THE COURT:*  Let me again reiterate and emphasize, this

2    is your opportunity to make your statement to the Court and

3    offer information in mitigation, lessening of the sentence that

4    this Court will impose, and for those purposes, you may

5    proceed.

6        *THE DEFENDANT:*  Okay.  I'm going to stand before you

7    to seek mitigation from your sentencing.  I let my lawyer --

8    you know, he spoke on that, but I just -- I never got an

9    opportunity to get up on the stand and to say my side of the

10   story because my past convictions, and I didn't want to let

11   that come into play.

12        I appreciate the energy and time the defense -- that

13   my lawyer put up and as far as my family and stuff like that

14   and, you know, that was all factual from reports and stuff from

15   ADX, the phone calls to my family and letters and stuff.

16        Probably so, I'll probably die in prison.  That's

17   something I'm willing -- don't really have no other choice but

18   to accept.  But the point is this.  This was a fight.  I got

19   charged with first-degree murder.  They was seeking the death

20   penalty and stuff like that.  If you would look at my past

21   criminal history or convictions, like the prosecutor said,

22   Mr. Duckett was the knife.  I was supposed to use Mr. Duckett

23   to kill Mr. Joiner.  Mr. Duckett said I came and asked for his

24   help.  I mean, you know, I couldn't say it.  I just sat there

25   and dealt with it.

1        I just want to say this.  I wish I could say more but,

2   like you say, this is for mitigation.  I really want to say

3   more, but it really don't matter.  But I just wanted my voice

4   to be heard.

5        I appreciate what Mr. Hammond was putting forth to you

6   far as my remorse and stuff like that.  I wish Mr. Joiner's

7   family was here so they could hear me, too, because I don't

8   feel he got a fair shake and one that anybody used to box.  I

9   used to train when I was younger but I stopped because I didn't

10  want to do the exercise.  But anybody that box, like tomorrow

11  Bradley and Pacquiao, they got a fight coming up tomorrow, it's

12  a one-on-one fight.  When it's never one-on-one, it's never

13  fair.  You understand my point?

14       I don't really think justice was served because your

15  case was based on a lie, but I'm willing to bear other people's

16  burden or lie.  I do that.  I do that because in the end you

17  the judge but at the end God going to judge you, too.  You see

18  what I'm saying?  That's something I got to live with everyday,

19  you know.

20       But I'm just telling you this, that for mitigation,

21  anything -- because if you give me 30 years, I'm going to

22  probably die in jail anyway.  You give me life or parole, it's

23  pretty much the same.  But I wish -- God knows best.  I wish

24  that the family of Mr. Joiner knew the truth and not what the

25  Government would tell them or what they would read about.

1          But that's all I wanted to say.  I wanted to say more

2   but, like you say, it's not -- this is reference to mitigation.

3   One thing I won't do, I won't place a lie or burden on somebody

4   else just to go home because I had a parole date this year,

5   too, but, you know, I can accept that.  I'll deal with that.

6          So whatever sentence you impose on me, you know, I

7   accept that, too.

8          THE COURT:  Well, Mr. Stewart, I don't want there to

9   be a misunderstanding.  I was reacting to you asking me a

10   question.  It's simply improper for me to answer your questions

11   in this legal context.

12          THE DEFENDANT:  Okay.  That's why I got him for.  I

13   apologize.  I ain't -- you know, I'm out of my arena.  Excuse

14   me again.

15          THE COURT:  But my point is this.  My remarks to you

16   were in no way intended or designed to prohibit, preclude, or

17   limit what it is that you want to tell me during this important

18   opportunity.  You seem to be under the impression that you're

19   limited to only matters of mitigation, and you're not.  This is

20   your opportunity to make your statement to the Court and to

21   speak about mitigation.  I want to be clear about that.

22          THE DEFENDANT:  Okay.  I understand that.  Everything

23   happened for a reason so, I mean, we here now.  The trial over

24   with.  It was 12 people that judged me.  They really don't know

25   me.  They really don't know the whole situation.  They went by

1     the testimony by several people that one saying I came to him

2     and begged him, you know.  I guess he want to be a leader or

3     something.  Of a guy that came and I asked him for his help

4     when, you know, anybody -- I'm sure, any of you, especially the

5     FBI, could look at my history.

6           I don't need nobody help, especially for no fighting.

7     I take it with me and go about my business.  Unfortunately,

8     Joiner died, but once he died, I felt my life was over with,

9     too, because once he died, I killed myself.  You understand

10    what I'm saying?  Because I have a history and in seven years I

11    maintained without getting in trouble and stuff like that and

12    it's been seven years since the incident.  That's the only

13    incident I ever had in 11 years at ADX, you know.

14          But for 19 years I been in solitary confinement

15    because a lot of ignorant mistakes I made.  But, like I say,

16    and like he told you, it's probably -- it's probably how I die,

17    you know.  These are the decisions we make, whether they bad or

18    good.  And I figure that in my life I have made a lot of bad

19    decisions, you know.  And my record speaks for it and

20    everything and other things maybe y'all don't know about but

21    whenever I pass to the next life.

22          Excuse my -- I'm talking too much.  I said I would be

23    brief.  The point is this, y'all do what y'all got to.  To the

24    Government, however you got to win, you got to win, but I know

25    the truth and I know my lawyer and them believe in me what

1    happened.  Unfortunately, I can't bring him back, but if you

2    look at the history, you actually think I would go and get

3    somebody to go and fight a guy that's smaller than me, not

4    stronger than me, and will hit me in my face 20 something

5    times, no marks, none of that, nah, nah.  So y'all got to twist

6    stuff.  Y'all got to do your case.  Y'all got into that because

7    you got to win.

8         My lawyers do the same thing because they trying to

9    win.  That was BS, man.  Excuse my language.  That was a lie.

10   But I ain't going to try to place my burden on somebody just

11   for me to go home.  It don't got nothing to do with snitching

12   or lying -- me snitching or ratting.  It got to do with

13   something with the truth, my principle.  You understand my

14   point?  Thank you for your time.

15        *THE COURT:*  You're welcome.  Again, you may all be

16   seated.

17        Mr. Troyer, does the Government wish to be heard on

18   matters material to the imposition of this sentence?

19        *MR. TROYER:*  We do, Your Honor.

20        *THE COURT:*  And you may.

21        *MR. TROYER:*  Your Honor, the defendant's criminal

22   history is undisputed.  His offense level is virtually

23   undisputed.  There's been talk about acceptance of

24   responsibility.  As the Court knows and the Government greatly

25   respects, the guideline emphasizes the great deference to the

1    sentencing court particularly when it comes to judging and

2    evaluating acceptance of responsibility.

3          I would emphasize only that acceptance of

4    responsibility has to do with acceptance of responsibility for

5    the offense of conviction, not acceptance of responsibility for

6    a fight.  Not acceptance of responsibility for a lie.  Not

7    acceptance of responsibility for manslaughter.  Acceptance of

8    responsibility for the offense of conviction.  That has not

9    been shown.

10         We've heard from Mr. Stewart today.  We could go over

11   the letters again, although Mr. Hammond quoted the portions I

12   might have quoted, probative of acceptance and remorse.

13         We heard today again and we hear in those letters,

14   this was a fight.  We've heard this is a lie.  That's not

15   acceptance.  That's not remorse.  We heard in the sentencing

16   statement, at least by way of attachment, somehow this is about

17   Greg Joiner's past and a violent murder he committed in 1995,

18   detailed in an attachment to the presentence report.  Pointing

19   that out about the victim is not remorse.  It's not acceptance

20   of responsibility.

21         We've heard about remorse expressed somehow as a

22   desire to get out of prison.  Your Honor, that's a common

23   desire -- a desire to go out is not an expression of remorse or

24   acceptance of responsibility.

25         The Government does credit Mr. Stewart in his

 1    expression of letters of sympathy for Mr. Joiner's family, but

 2    they're never, even to this day, is acceptance of

 3    responsibility for this offense of conviction.  It was a fight.

 4    It wasn't his fault.  He's not guilty.  It's all a lie.

 5            In terms of disparity of sentence not particularly

 6    articulated that way, but Mr. Hammond began by noting what he

 7    purported to be a disparity between second-degree murder in the

 8    state and the federal system.  If that could be construed as a

 9    3553(a) argument regarding disparity, I would point out simply

10    that there's no disparity in the first place given

11    Mr. Stewart's criminal history.  He would be sentenced under

12    the habitual offender statute in the state system and would,

13    likely, be looking at a sentence in the state of the same

14    conduct of approximately 150 years.

15            The relevant inquiry, as the Court knows under

16    3553(a), regardless, is disparity among federal sentences.

17    Clearly, this is a sentence, the life sentence the Government

18    believes is appropriate.  It is not dispirit.  It's

19    contemplated in the statute.  It's contemplated in the

20    guidelines.

21            In terms of mitigation, Your Honor, at the end of the

22    day, this is a human being.  This is a man who has desires.

23    This is a man who has expressed remorse to Mr. Joiner's family,

24    a man, like many of us, unique and yet common in his desires

25    and his hopes and his dreams.  A man, however, who cannot

1   prevent himself from committing violence that destroys other

2   people and their lives, despite those positive hopes and

3   dreams, no matter what the circumstance, no matter what

4   controls are in place, no matter if he is in the most secure

5   facility perhaps in the world.

6           Given that repeated expression of that final behavior,

7   the Government again submits that a life sentence is

8   appropriate for Mr. Stewart.  Thank you.

9           *THE COURT:*  You're welcome.

10          While at the podium, let me inquire.  Are there any

11  representatives on behalf of the victim present in open court

12  seeking to be heard?

13          *MR. TROYER:*  There are not, Your Honor.

14          *THE COURT:*  Very well.  May I presume that all such

15  representatives have received at all times proper notification

16  and afforded such an opportunity?

17          *MR. TROYER:*  We have received notification throughout

18  the proceedings, throughout pre-indictment, post-indictment,

19  pretrial, post-trial, and, in fact, two of Mr. Joiner's

20  siblings were planning on attending today and had a change of

21  heart at the last moment.  But all of the notification

22  requirements and contacts have, in fact, been complied with.

23          *THE COURT:*  Very well.  Thank you.

24          *MR. TROYER:*  Thank you.

25          Ms. Steffens, would you approach the bench, please.

1    Excuse us.

2              (Pause in proceedings.)

3              *THE COURT:*  Counsel, we're into the traditional noon

4    hour.  I know members of my staff have plans for today.  It

5    would be my preference, therefore, rather than to press on,

6    but, instead, to recess these proceedings until 1:00 p.m., of

7    course, assuming your availability.

8              Please feel free to confer briefly between and among

9    yourselves.

10             Mr. Troyer.

11             *MR. TROYER:*  The Government has no objection to

12   continuing at 1:00, Your Honor.

13             *THE COURT:*  Mr. Hammond, Ms. Simonet.

14             *MR. HAMMOND:*  We're available, Your Honor.

15             *THE COURT:*  Then in these circumstances, this

16   sentencing hearing is in recess, and we will resume at 1:00

17   p.m. as gauged by the courtroom clock.

18             Madam clerk, please declare the noon recess of the

19   Court.

20             (Recess taken from 12:07 to 1:05.)

21             *THE COURT:*  Good afternoon, and thank you.  Please be

22   seated.

23             We again resume on the record in open court,

24   continuing and resuming the sentencing hearing in 10-cr-00129,

25   United States of America versus Dominic D. Stewart.

1          Madam reporter, please note the appearances of all

2     parties in interest as previously.

3          In considering, fashioning, and now imposing a condign

4     and constitutional sentence, I have considered all relevant

5     matters of fact and law, including the following:

6          All of the relevant and material evidence presented

7     during both pretrial and trial proceedings.

8          The nature and circumstances of the crime for which

9     Mr. Stewart was convicted after trial by jury, focusing, as I

10    must and should, on its real conduct.

11         The history and characteristics of Mr. Stewart as the

12    offender.

13         The sentences that are authorized by law in these

14    circumstances for the crime of conviction.

15         The presentence report and both concomitant addenda.

16         The basic purposes of criminal punishment as declared

17    by Congress in the superintending Sentencing Reform Act of

18    1984, focusing on deterrence, incapacitation, just punishment,

19    and rehabilitation.

20         The purposes and goals of sentencing as prescribed by

21    Congress in the familiar 18 U.S.C. Section 3553(a)(1) through

22    (7), particularly subsection (2).

23         The factors that I must consider as a matter of law in

24    my imposition of sentence, codified at 18 U.S.C. Sections

25    3582(a) and the more familiar 3553(a)(1) through (7).

1          The constitutional and relevant provisions of the now

2     advisory United States sentencing guidelines as they apply to

3     this offense, this offender, and all relevant conduct.

4          The kinds of sentence and sentencing range established

5     under those advisory sentencing guidelines for this applicable

6     category of offense committed by this applicable category of

7     defendant, a clear reference to Section 3553(a)(4).

8          The continuing and important need always to avoid

9     unwarranted sentencing disparities.

10          All pertinent policy statements of the United States

11    Sentencing Commission.

12          The need to impose a sentence that recognizes and

13    reinforces the requirements and needs of 18 U.S.C. Section

14    3553(a)(2).

15          The advancement of the seminal congressional goals of

16    sentencing of honesty, uniformity, and proportionality.

17          The principle and requirement now codified at 18

18    U.S.C. Section 3553(a) to impose a sentence sufficient but not

19    greater than necessary to satisfy the requirements and

20    principles of the sentencing statute.

21          The propriety or necessity of imposing concurrent or

22    consecutive sentences after considering, for the count of

23    conviction, the provisions of 18 U.S.C. Section 3584(a) and (b)

24    and 18 U.S.C. Section 3553(a)(1) through (7) and, in these

25    circumstances, the provisions of guideline Section 5G1.3(a).

1          The position, of course, of all parties in interest,

2     the Government, the defense, including defense counsel, and

3     Mr. Stewart himself, and the probation department.

4          The relevant papers, especially Dominic Stewart's

5     sentencing statement, document 531, and its concomitant 12

6     attachments, Exhibits A through L.

7          All relevant information concerning the background,

8     character, and conduct of Mr. Stewart in the exercise of my

9     discretion under 18 U.S.C. Section 3661 and guideline section

10    1B1.4.

11         And, lastly, but certainly importantly, all facts,

12    information, and evidence presented, reasons stated, arguments

13    advanced, and authority cited either in their sentencing papers

14    or during this sentencing hearing.

15         Having engaged in that extensive and comprehensive

16    sentencing analysis, I now make the following sentencing

17    statement, which I must, under 18 U.S.C. Section 3553(c).

18         Thus, based on this relevant record considered as a

19    whole, I now enter the following findings of fact, conclusions

20    of law, judgment of conviction, sentence, and orders,

21    commencing with my findings and conclusions.

22         That initially, but importantly, I approve, adopt, and

23    incorporate in my sentencing statement the myriad matters which

24    I have considered carefully and noted just now on the record.

25         That neither the Government, nor Mr. Stewart, has

1  filed formal or substantive objections to the presentence

2  report.  Therefore, I exercise my discretion under Federal

3  Rules of Criminal Procedure 32(i)(3)(A) to accept that

4  presentence report, especially its advisory sentencing

5  guideline applications and calculations as an integral part of

6  my findings of fact.

7  　　　　That after trial by jury, on March 8, 2012,

8  Mr. Stewart was found guilty of the crime charged in Count 2 of

9  the indictment, the crime of murder in the second degree, in

10  violation of 18 U.S.C. Section 1111(a) and 7(3), a class A

11  felony, committed on or about and between May 26, 2005, and

12  June 1, 2005.

13  　　　　That the November 2011 edition of the United States

14  Sentencing Commission Guidelines Manual applies.  Thus, I have

15  used that starting point as the initial benchmark for my own

16  sentencing analysis.

17  　　　　Identification, consideration, and application of all

18  relevant advisory sentencing guidelines to this offense, this

19  offender, and all relevant conduct produces a total adjusted

20  advisory offense level of 40 and an advisory criminal history

21  category of VI.

22  　　　　That, in turn, the advisory sentencing guideline

23  ranges are imprisonment, 360 months to life; supervised

24  release, two to five years; and fines ranging from $25,000 to

25  $250,000.

1          That there is no reason or request to depart from the
2     advisory sentencing guideline range.

3          Thus, having considered all that I have thus far, I
4     now consider the individual and discrete sentencing factors and
5     needs found at the familiar 18 U.S.C. Section 3553(a)(1)
6     through (7) and conduct an individualized assessment based on
7     the facts presented.

8          Concerning the nature and circumstances of the
9     offense, the murder of Gregory Joiner in the second degree, I
10    find and conclude as follows:

11         The evidence I heard at trial easily satisfied the
12    requirements for second-degree murder.  In fact, based on the
13    evidence at trial, in my view, the choice was never between
14    second-degree murder and manslaughter, but, instead, between
15    first-degree murder and second-degree murder.

16         This murder, this homicide, can and should be
17    described with such words as brutal, savage, gruesome, and
18    merciless.  The crime threatened directly the safety and
19    security of the staff and inmates of the Bureau of Prisons and,
20    frankly, its safe and secure administration and operation.
21    This fits easily the definition of a serious criminal offense.

22         Concerning the history and characteristics of
23    Mr. Stewart as the offender, I have viewed him as the unique
24    being that God created.  He is a relatively young man, flesh
25    and bones, who has the same dreams and plans and aspirations

1   that many of us do now circumscribed and cabined by his

2   unfortunate circumstances.  He's 36 years of age.  He has not

3   one but two GEDs after dropping out of school in the ninth

4   grade.  His marriage to T. Preston in 1998 while he was

5   incarcerated was annulled in 2003.  There are no dependents

6   formally reported, although Mr. Stewart believes he has a

7   daughter and may have other children.

8          He has no military service, no outstanding service to

9   country or community otherwise.  He certainly grew up in a

10  rough and violent part of our country.  Ironically, in our

11  nation's capital, or nearby neighborhood.  He has little very

12  post-offense rehabilitation.  There is no acceptance of

13  responsibility in the legal or technical sense; that is, within

14  the meaning of application of note 1 to guideline section

15  3E1.1.

16         Because there is no pretrial statements and conduct

17  whereby Mr. Stewart truthfully admits the conduct comprising

18  the count of conviction, acceptance of responsibility is a

19  cabined term.  It does not allow the defendant to choose the

20  conduct and circumstances for which he accepts responsibility,

21  but it's clear that Mr. Stewart even today denies the

22  commission of second-degree murder, describing it, instead, at

23  a minimum, as just a fistfight or, perhaps, manslaughter.

24         He certainly has no understated criminal history.  In

25  fact, Mr. Stewart is a legitimate, bona fide career offender

1   within the meaning of Guideline Section 4B1.1.  He has a

2   violent and aggravated criminal history, starting at age 17,

3   punctuated with extreme acts of violence.  He has committed

4   violent felonies, both in and out of prison.

5          At age 17, he was convicted of second-degree murder

6   while armed in possession of a firearm of a violent felony for

7   which he was sentenced to 12 years to life.  At age 18, he was

8   convicted of mayhem while armed for which he was sentenced to a

9   consecutive sentence of 8 to 15 years.  At age 23, he was

10  convicted of two counts of prisoner in possession of a shank.

11  All of these are violent felonies committed with dangerous

12  weapons, and all resulted in the serious bodily injury or death

13  to the victims.

14         As a result, Mr. Stewart has been incarcerated

15  continuously since 1993.  While incarcerated, Mr. Stewart has

16  received several disciplinary violations for violent and

17  assaultive conduct.  In this tough neighborhood in a suburb of

18  our nation's capital, he was raised by his mother and

19  grandmother who provided a loving home.  Thank goodness,

20  Mr. Stewart today is in good physical condition and health, not

21  under the care of a physician.  He, of course, has no

22  independent income or financial resources, either presently or

23  prospectively.  He has what I would describe as a Jekyll-Hyde

24  personality.  There's the calm, cool, and collected Mr. Stewart

25  that, for the most part, we see in court throughout pretrial

1    and trial proceedings.  And then there's the Mr. Stewart with

2    that explosive, violent, intractable temper, such so that when

3    Mr. Stewart loses his temper, almost always someone is

4    seriously injured or killed.

5          Now, the debate is about whether or not Mr. Stewart is

6    credibly contrite.  Well, he is, and he isn't.  He's certainly

7    sorry for the circumstances that he has created for himself and

8    his family.  He's not nearly as credible, not nearly as

9    contrite when it comes to Gregory Joiner or his family.

10         I did read all of the exhibits and attachments

11   appended to the sentencing statement, Exhibits A through L,

12   and, like counsel for the defendant, I focused on many of the

13   same letters but came away with a different perspective.

14         In his letter to "Kim," document 531-1, he attempts to

15   minimize this crime.  In his letter to "Pop," document 532-2,

16   he expresses disappointment in others, and I quote Mr. Stewart,

17   "My soul still screams about how people just dishonored me, a

18   wound that will never heal."

19         In a letter to his mother, 531-2, he displays almost a

20   total lack of understanding and appreciation for his murder of

21   Gregory Joiner.  I quote Mr. Stewart again, "I will be called

22   evil, violent, et cetera, when it was just a fistfight."  Well,

23   in all these words and sentences and paragraphs and all these

24   letters, there is a disturbing dearth and paucity of references

25   to Mr. Joiner and his family.  Expressions of contrite or

1  sympathy or empathy are the same.  I listened to a relatively

2  lengthy allocution by Mr. Stewart this morning.  And I took

3  note, "Once he died," speaking to Mr. Joiner, "I killed

4  myself."  There's a theme, and it is this myopic focus on self.

5       These submissions and statements corroborate my own

6  conclusion that Mr. Stewart evinces a disturbing lack of

7  understanding and appreciation of the serious and egregious

8  nature and circumstances of his murder of Gregory Joiner or the

9  consequences of that murder.

10       Mr. Stewart has little to no true empathy for his

11  victim or the victim's family.  It is true that repeatedly he

12  expresses sorrow for himself and his circumstances and those of

13  his family and friends.  Very little attention is paid to

14  Gregory Joiner.  In fact, in the submissions I was submitted a

15  paper filed in Mr. Joiner's case, a paper undoubtedly of which

16  Mr. Stewart was totally unaware when he murdered Mr. Joiner,

17  and, yet, it was offered to me to again paint Mr. Joiner in a

18  poor light.

19       This misses the point.  Mr. Stewart has now brutally

20  murdered two men.  He must be considered and characterized as

21  assaultive and homicidal, especially now to inmates that

22  interact with him in a way in which he disagrees.  There's no

23  cogent evidence that Mr. Stewart will not kill again.  There is

24  no evidence or information that Mr. Stewart would act or react

25  differently out of prison in those inevitable times or

1  circumstances involving interpersonal difficulties or

2  confrontations with members of the community, noninmates.

3       The argument of the defense was largely ad hominem.

4  It tugged at the sympathetic heart strings of the Court.  Well,

5  I attempt to discharge my constitutional duties without passion

6  and without prejudice.  The argument of the defense is that we

7  could and should have expected this violence from Mr. Stewart.

8  Look at where and how he grew up.  Consider the violence in his

9  neighborhood.  Consider his early prison experience in such

10  abominable places as Lorton and Red Onion.  He is the natural

11  and predictable product of such a violent environment.

12       The problem is, all of this leaves no room for that

13  which must exist.  Personal responsibility.  Individual

14  accountability, and the defendant's argument proves too much

15  because it proves that what we now and should expect from

16  Mr. Stewart are periodic violent murders, assaultive outbursts.

17       All things considered, I conclude ultimately that only

18  a life-long sentence will reflect the seriousness of and

19  provide just punishment for this needless, senseless, brutal

20  murder.  Only a life sentence will protect the public from

21  inevitable further crimes of the defendant and provide a

22  modicum of deterrence, and a life sentence in these

23  circumstances certainly will not be considered dispirit.

24       There was an exhortation, at least implicitly, by the

25  defense that I compare state law and state law punishment for

1   murder in the second degree as it's known under the Colorado

2   Revised Statutes and murder in the second degree as it's known

3   in Title 18.  And when I do that, I arrive at the same location

4   as Mr. Troyer.  In these circumstances, Mr. Stewart would be

5   facing what is tantamount to a life sentence because,

6   undoubtedly, he would be, and rightfully so, a habitual

7   criminal.

8        That's not the compared analysis that should be paid,

9   not state law versus federal law.

10        I conclude ultimately that a sentence to life in

11   prison is sufficient but not greater than necessary to satisfy

12   the goals and purposes declared by Congress in our sentencing

13   statutory scheme.

14        That after considering the factors at 18 U.S.C. 3013

15   and 3572(a), I conclude the obvious; that Mr. Stewart is

16   indigent, impecunious, both presently and prospectively; thus,

17   unable to pay a fine.  Therefore, no fine should be imposed.

18        That there was a potential for restitution but despite

19   the best efforts of the office of the U.S. Attorney in the

20   District of Colorado and its competent victim advocates and

21   representatives, no request, either directly or indirectly, for

22   restitution has been made to the Court.

23        Therefore, it is ordered as follows:

24        That judgment of conviction shall now enter on Count

25   Two of the indictment for the crime of the murder of Gregory

1    Joiner in the second degree in violation of 18 U.S.C. Section

2    1111(a) and 7(3), a class A felony.

3            That pursuant to the Sentencing Reform Act of 1984, it

4    is the judgment and sentence of this Court that the defendant,

5    Dominic D. Stewart, be committed to the Bureau of Prisons to be

6    imprisoned for a term of his natural life.

7            That no term of supervised release is now imposed

8    because, frankly, it will be superfluous.

9            I must digress to determine whether or not this life

10   sentence should be imposed concurrently or consecutively.  For

11   that, I have discharged my duty by considering the condign

12   provisions of 18 U.S.C. Sections 3584(a) and (b), 3553(a)(1)

13   through (7), and Guideline Section 5G1.3.

14           Based on that analysis, I conclude that the sentence

15   to life in this case should be imposed consecutively to all

16   previously imposed sentences in state and/or federal court,

17   including, but not limited to, the life sentence imposed by the

18   United States District Court for the eastern district of

19   Virginia in case No. 99CR74-001.

20           That no fine is imposed.

21           That as required by federal law, Mr. Stewart shall pay

22   forthwith a special victim's fund assessment of $100.

23           That presentence confinement shall be determined by

24   the Bureau of Prisons as required by federal law at 18 U.S.C.

25   Section 3585.

1         Lastly, that Mr. Stewart is remanded to the custody of

2    the United States Marshal who shall transport and return him to

3    the Bureau of Prisons as soon as practicable and with all

4    deliberate speed where again he shall be kept in the manner

5    prescribed by law consistent with the orders of this Court.

6         Counsel, I give you this opportunity to state any

7    objection to the sentence imposed by the Court.  Any objection

8    by the Government?

9         MR. TROYER:  No, Your Honor.

10        THE COURT:  Any objection on behalf of Mr. Stewart,

11   Mr. Hammond?

12        MR. HAMMOND:  Yes, Your Honor.  Respectfully, there

13   are a number of objections that I have that I know the Court

14   knows I have to preserve at this time.

15        THE COURT:  No offense taken, Mr. Hammond.  You do

16   your job.

17        MR. HAMMOND:  Thank you.

18        THE COURT:  You're welcome.

19        MR. HAMMOND:  The Court discussed the possession of

20   shank, one of which is 99CR74, which the Court just mentioned.

21   I don't know whether the Court meant that colloquially or not

22   as a violent crime.

23        One of the papers submitted with the sentencing

24   statement was a paper that was a combined statement by the

25   defense and the Government in that case, 99CR74, saying it was

1    not a crime of violence for sentencing purposes.

2         The documents regarding Mr. Joiner, Mr. Stewart,

3    obviously, did not know that these were submitted.  Those were

4    submitted by me.  Frankly, Your Honor, that was not to paint

5    Mr. Joiner in a bad light.  That was to provide the

6    documentation that we discussed during the trial to make sure

7    that the Court understood that what had happened did happen in

8    fact.

9         One of the things we know about Administrative Maximum

10   is almost everybody who is in there is in there because of

11   violent criminal histories.  I respectfully object to the

12   argument from the defense as being ad hominem that it was about

13   Mr. Joiner.

14        I tried to explain to the Court that I believed

15   Mr. Stewart acted in the heat of passion, and the Court stated

16   that there was a defense strategy that we should have expected

17   this because of where Mr. Stewart grew up and how he grew up.

18   I did not mean it in that context.  I meant it so the Court

19   would have a full picture of Mr. Stewart for mitigation

20   purposes.

21        Finally, I believe it is appropriate to compare and

22   contrast, not necessarily fault, but certainly take into

23   consideration the differences between the state and federal law

24   and the crime of second-degree murder.  That's all I have.

25   Thank you.

1    *THE COURT:*  Counsel, thank you.  A brief response so

2    that the record is clear.  I took the title of the crime I

3    described as prisoner in possession of shank directly from the

4    presentence report at paragraph 34 to which Mr. Stewart did not

5    object.  There was, in my view, no need to prove up the violent

6    crime committed by the victim, Gregory Joiner.  Why?  Because

7    it was reiterated and discussed periodically throughout the

8    course of the trial, and the evidence was uncontroverted and

9    unrebutted.  Beyond that, the record is what it is, and will be

10   for the Court of Appeals to determine.

11        Mr. Stewart, I advise you as follows.  You have the

12   right to appeal your conviction and the sentence imposed to a

13   higher court, the Tenth Circuit Court of Appeals.  However, and

14   please listen carefully, you must file your notice of appeal

15   within 14 days of the formal entry of judgment in this case, or

16   your right of appeal will be forfeited, lost.  If you are

17   unable to afford the cost of an appeal, you have the right to

18   request permission to appeal as a poor person or, as we know,

19   in forma pauperis.

20        You have the right to be represented during any such

21   appeal by an attorney.  If you want an attorney but cannot

22   afford one, the Court will appoint an attorney to represent you

23   during the appeal at the expense of the Government.

24        And, finally, at your request, the clerk of the Court

25   shall prepare and file a notice of appeal on your behalf

 1    immediately.

 2           Do you understand these additional appellate legal

 3    rights that you now have?

 4           *THE DEFENDANT:*  I understand.

 5           *THE COURT:*  Very well.

 6           Further business to come before the Court in this case

 7    by the Government?

 8           *MR. TROYER:*  No, Your Honor.  Thank you.

 9           *THE COURT:*  Or on behalf of Mr. Stewart, Mr. Hammond?

10           *MR. HAMMOND:*  No, Your Honor.

11           *THE COURT:*  Very well.

12           Again, for the record, a special thanks to these

13    deputy United States Marshals.  Men, thank you for your service

14    to the Court in this case.

15           The Court is in momentary recess with a 1:30 p.m.

16    docket.

17           Therefore, madam clerk, please declare the recess of

18    the Court.

19           (Court stood in recess at 1:36.)

20

21

22

23

24

25

1       * * * * *

2     **REPORTER'S CERTIFICATE**

3   I certify that the foregoing is a correct transcript from

4 the record of proceedings in the above-entitled matter.  Dated

5 at Denver, Colorado, this 17th day of September, 2012.

6

7          *S/Tracy Weir*

8          Tracy Weir

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25